**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Michael Kent POLAND and Patrick Gene
Poland, Defendants-Appellants.**

Nos. 79–1459, 79–1460.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 14, 1981.

Decided Aug. 18, 1981.

James Hamilton Kemper, Phoenix, Ariz., for Michael Poland.

M. Jeremy Toles, Stephens & Toles, P.C., Phoenix, Ariz., for Patrick Poland.

Michael B. Scott, Asst. U.S. Atty., Phoenix, Ariz., for U.S.A.

Before ANDERSON and TANG, Circuit Judges, and WYATT *, District Judge.

PER CURIAM:

Michael Kent Poland (Mike) and Patrick Gene Poland (Pat), brothers, appeal from separate judgments entered in the United States District Court for the District of Arizona convicting each of five counts of robbery in violation of 18 U.S.C. § 2113(a) and two counts of kidnapping in violation of 18 U.S.C. § 2113(e). A jury had found the defendants guilty on all of these counts. The two defendants had been indicted jointly and tried together. We affirm the judgments of conviction.

1.

On May 24, 1977, two-driver-guards left Phoenix driving a Purolator Security, Inc. van containing currency for delivery to a number of banks in Northern Arizona. The run they were to make was routinely made every Tuesday morning leaving at seven o'clock. Beginning on Interstate Highway 17, the drivers were to drive the van north from Phoenix; their first delivery was to be to a bank in Prescott, about a hundred miles away. The van never got to Prescott. It was found the next morning, abandoned near the Bumble Bee turnoff from Highway 17, about 50 miles north of Phoenix. The currency was missing from the van.

On June 16, 1977, the body of one of the drivers was found floating in Lake Mead, about 300 miles from where the van had been left. A week later the body of the other driver was recovered in the same part of Lake Mead.

A federal grand jury at Phoenix returned an indictment against Mike and Pat on May 17, 1978. The two defendants were charged jointly in nine counts. The first five counts charged bank robbery in violation of 18 U.S.C. § 2113(a). Each of the five counts named a different bank as owner of a sum of money charged to have been taken by the two defendants. Two other counts charged the defendants with kidnapping the two drivers in violation of 18 U.S.C. § 2113(e).

Among the several others, there were pretrial motions by the defendants to suppress as evidence items seized during searches made on July 27, 1977, and on May 25, 1978. The searches were authorized by warrants issued by Judge Copple and by Magistrate Gormley. Because Judge Copple had issued most of the search warrants, he—on request—disqualified himself from deciding their validity. Judge Turrentine heard the matter in Phoenix on August 18, 1978, and at the conclusion denied the motions to suppress. He thereafter on August 28, 1978 filed a memorandum opinion and an order denying the motions.

---

* Honorable Inzer B. Wyatt, United States District Judge, Southern District of New York, sitting by designation.

On August 17, 1978, the United States Attorney filed a dismissal of the two murder counts of the indictment pursuant to leave of court.

On July 21, 1978, counsel for Mike filed a motion under Federal Rule of Criminal Procedure 21(a) for an order "changing the venue of his trial from the District of Arizona to a district wherein the defendant will be free from prejudicial pretrial publicity." At a hearing on August 8, 1978, the district court denied the motion. The motion was renewed on December 18, 1978, and at that time counsel for Pat joined in the motion. The district court then denied the motion for change of venue outside the District of Arizona but ordered the trial to be transferred within the District to Tucson, setting a January 16, 1979 trial date.

At Tucson, the indictment was assigned to Judge Frey who, on December 22, 1978, set the case for trial to begin at Tucson on January 16, 1979, before Judge Murphy (of the Southern District of New York, sitting by designation).

The trial began before Judge Murphy and a jury at Tucson on January 16, 1979. Both sides rested on February 12, following testimony by both defendants and rebuttal. The jury began deliberating on February 13 and in the early afternoon of February 14 returned a guilty verdict as to each defendant on each of the seven counts submitted.

The court imposed sentences on March 14, 1979, giving each defendant 20 years on each of the first five counts to run concurrently with each other, and giving 40 years on Count VI and 40 years on Count VII, to run consecutively and consecutive to the sentences on the first five counts, or a total sentence of 100 years of imprisonment. Fines amounting to $50,000 were imposed on each defendant.

These appeals followed.

### 2.

The principal argument made for appellant Pat is that there was improper intervention by the trial judge. This intervention is said to have been "in unduly interrupting both defense counsel, in criticizing and ridiculing them before the jury, and in showing extreme partisanship towards the prosecution to the extent even of assuming the role of the prosecution." The intervention is said to have "denied him [appellant Pat] a fair and impartial trial." Appellant Mike does not make this argument but in his brief he states that he joins in "any argument" made for Pat.

If we should accept the argument that the trial judge did intervene improperly to the extent that error was committed, there can be no reversal of the convictions unless we also find that the intervention significantly prejudiced the defendants. And in considering whether there was any such significant prejudice, we should look to the evidence to see whether the issue of guilt was a close one—in which event prejudice from the error is more likely to have occurred—or whether evidence of guilt was overwhelming—in which event prejudice from the error is much less likely to have occurred. This Court stated the principle very succinctly in *United States v. Allen*, 431 F.2d 712, 713 (1970): "And even if it could be said that the several comments, considered as a whole, constituted error, the error could not have operated so as to prejudice significantly, the rights of the accused. The evidence of his guilt was overwhelming."

We examine the evidence, therefore, to see what the proof was of the guilt of these appellants.

### 3.

The evidence is clearly sufficient to support the convictions; indeed, appellants make no contention that the evidence was insufficient. The defendants did deny in their testimony that *they* committed the offenses. There is no dispute, however, as to the commission of the offenses, nor as to how they were committed.

Since there were no eye witnesses to the commission of the offenses, the evidence that appellants committed them was, of necessity, circumstantial. In respect of crimes of violence, this is frequently the case and is of no significance: "it is a

time-tested rule in this circuit that circumstantial evidence is not inherently less probative than direct evidence." *United States v. Green*, 554 F.2d 372, 375 (9th Cir. 1977).

### 4.

Mike and Pat had been living in Phoenix for some time before May 1977. Neither had any history of sustained gainful employment, although the record contains vague references to intermittent jobs they may have held.

When Mike lost a civil personal injury action in the summer of 1976—an action he had expected to win—it left him and his family in his words "destitute, practically." He could not pay his debt for property in Oregon and had to give it up. The only thing he could do was to leave Oregon. When Mike returned to Phoenix in about May or June 1976, he moved in with Pat, then with his father, and finally settled into his own apartment. He borrowed money from his wife's father and his own father. He used his father's credit cards to pay for gasoline, clothes for his family, and the like. He had past due, delinquent bills for medical and dental services.

Pat, before May 24, 1977, was equally without money. He borrowed from his father and used his father's credit cards, just as Mike had done. Pat also borrowed from his younger brother and a friend. According to their father, by May 24, 1977, Mike and Pat, between them, owed him more than $15,000.

### 5.

The evidence shows that for several months before May 24, 1977, Mike and Pat made preparations for the crime. These included making arrangements to impersonate Arizona Highway Patrol officers so as to be able to stop the Purolator van on the highway without arousing suspicion.

In December 1976, Mike and Pat leased two Chevrolet Malibu four-door sedans, one silver and one white, similar to those used by the Arizona Highway Patrol. They asked that the charge on the car for Mike be to the credit card of his father-in-law, and on the car for Pat to the credit card of his father. After taking possession of the cars, Mike and Pat equipped each car with a police-type siren activated by a toggle switch on the dashboard.

On February 1, 1977, Pat ordered a short wave radio "scanner" from a shop in a Phoenix suburb, an item of equipment frequently used by police. Pat also ordered a special item of scanner equipment, a digital frequency selector. A few days after February 1, 1977, Pat picked up and paid for the equipment he had ordered. Pat told the salesman to show the name of Mike on the invoice because Mike was furnishing the money. The jury could have found that Mike and Pat bought this equipment to enable them to determine at any time the number and location of highway patrol cars in the Highway 17 area north of Phoenix.

On the weekend beginning February 4, 1977, Mike and his family visited his stepsister in Flagstaff, Arizona. The stepsister's husband had formerly been a police officer. He kept a three-volume police manual on operations and procedures on open bookshelves in his house, where Mike was staying. On the first afternoon of his visit, Mike was observed reading the police manual on two occasions for not less than an hour each time. Again, on the following afternoon Mike was observed reading the police manual.

On February 7, 1977, a man calling himself Mark Harris telephoned from Phoenix to a gunshop in Tucson. He said he had been referred to that shop by the manufacturer of the taser device, a new product designed to stun and disable a person by disruption of the nervous system. He wanted to buy a taser and was told that with a deposit the device would be ordered for him. He came in on February 9, 1977, identified himself as Mark Harris, made the deposit and was given a receipt. On February 11, the taser arrived in Tucson. The shop called a number in Phoenix given by Mark Harris, spoke to him, and reported that the taser had arrived. Mark Harris came in very soon afterwards with another

man, paid the balance of the price, was given a receipt, and picked up the taser. The salesman who handled every step of the transaction identified Pat as the person who represented himself to be Mark Harris and identified Mike as the man with "Mark Harris" on February 11, 1977. The significance of this incident is not so much that it shows purchase of a device to stun and disable as that it shows that Pat used the alias "Mark Harris."

On April 25, 1977, Pat ordered three canvas bags from a Phoenix company to be made in dimensions to his order. They were made, were delivered to him on the next day, and were paid for with cash. He also bought 100 feet of a distinctive green and white cord or rope, called "Rover Rope." The Phoenix company was the only company in Arizona that sold Rover Rope. Although there was no identification of Pat by sight as the purchaser of the canvas bags and the Rover Rope, the company's business records showed that the purchaser of the three canvas bags and the Rover Rope had used the name Mark Harris. From the evidence, the jury could find that Pat Poland, using an alias "Mark Harris," was this purchaser.

On Tuesday, May 10, 1977, a person made a collect call at 8:09 a. m. from a pay telephone with a 374 prefix number. This prefix is that of the Black Canyon area around Black Canyon City, north of Phoenix and before the Bumble Bee turnoff. The caller identified himself to the operator as Mike Poland and charged the call to the number of Mike's residence or to that of his father. There are several pay telephone booths with a 374 prefix along Highway 17 in the Black Canyon area. From these booths there was a clear view of the north bound lane of Highway 17. The jury could have found that on Tuesday, May 10, 1977, Mike was on Highway 17 investigating the regular Tuesday run of the Purolator van, which was scheduled to pass Black Canyon City in the general time frame in which Mike was there.

On May 18, 1977, Mike and Pat bought a "light bar" from a supply company in Phoe-

nix. A light bar is a device that holds one or more rotating domed lights and is used principally by police vehicles and ambulances; it is illegal to use a red light in a light bar except on police or fire department vehicles or ambulances. The salesman and the receptionist at the company, both of whom saw and talked to Mike and Pat on more than one occasion, identified them as the purchasers of the light bar. Mike and Pat did not give their names, but said they were starting a towing service and wanted the light bar for a tow truck. The invoices were made out to "Harper's Towing," the name given by Mike. They gave no address; instead Mike said they were new in the business and did not have an address yet, and that since it was a cash sale there was no need for an address. Tow truck operators in Arizona are required to be registered with the Department of Public Safety; no "Harper's Towing" was so registered.

On a weekend in May 1977, not later than the weekend beginning Friday, May 20, Mike called one of his friends who had formerly been a Phoenix police officer. Mike asked him if he still had the Sam Brown belt he had worn on the Phoenix police force. A Sam Brown belt is commonly worn by police officers; it has a pistol holster, shell cases, and a handcuff case. Mike explained that they were combat shooting on a National Guard range and he needed a holster belt for his brother. The friend said that he had turned in his belt when he left the force, but gave Mike the names of two stores in Phoenix where he could buy such a belt.

### 6.

As noted earlier, the two driver-guards left Phoenix with the money in the Purolator van about eight o'clock in the morning of Tuesday, May 24, 1977. They started about an hour later than usual, because of some minor mechanical trouble with the vehicle. They never reached Prescott, their first scheduled stop; they were never seen alive again.

There was testimony of the Ackers, a husband and wife, who were driving in a

car together on Highway 17 north from Phoenix on the morning of May 24, 1977.[1] Their testimony was that about nine-thirty or ten o'clock that morning, near the Bumble Bee turnoff, they saw a Purolator van stopped in the dirt about 25 or 30 feet from the highway.

The Ackers saw a man standing near the door of the van on the driver's side; both doors of the van were open. The wife "thought perhaps he was a Highway Patrolman" because he had on what appeared to be a uniform, tan trousers and shirt, with a patch on the arm. Both husband and wife identified the man by the Purolator van as Pat Poland.

Records of the Arizona Department of Highway Safety established that between the hours of seven a. m. and noon on May 24, 1977, there was no Highway Patrolman on duty on Highway 17 between Phoenix and a point some 25 miles north of the Bumble Bee turnoff. Thus, the evidence suggests that Mike and Pat, masquerading as Highway Patrolmen, stopped the Purolator van with the money at Bumble Bee.

Another husband and wife who had driven north from Phoenix on Highway 17 on the morning of May 24, 1977 testified. Between about nine and ten o'clock that morning they came up to and passed by a white car stopped in the right lane going north just before Bumble Bee turnoff. A man was in the car on the driver's side in the front seat, leaning over the wheel. Another man, in a uniform, was outside and behind the car with one foot on the rear bumper. He appeared nervous and his actions suggested that he was a lookout. This couple also saw the van, down and off the road in the dirt south of the underpass at the Bumble Bee turnoff. The husband (who had been the driver) did not identify either man with the car on the highway. The wife identified the "nervous" man as Mike Poland.

On the afternoon of May 24, between 2:00 and 4:00 p. m., Mike and Pat appeared at the home of their father to borrow their father's 1972 Chevrolet pick-up truck and a tarpaulin that their father had always used with the truck to protect the truck bed. On May 24, he was using the tarpaulin to cover some sacks of cement in his backyard because it had been raining. They did not tell their father why they needed the truck or tarpaulin nor where they were going.

### 7.

Lake Mead is some 300 miles northwest of the Bumble Bee turnoff. Temple Bar is the only developed area on the Arizona shore and is the least used of the nine or ten such areas on the lake. Bonelli Landing ("Bonelli") is an even more remote area on the Arizona shore, west and slightly north of Temple Bar. By road it is about 19 miles from Temple Bar to Bonelli; by water it is about 16 miles from Temple Bar to Bonelli. Bonelli is the least used of the three primitive camp grounds maintained by the Park Service on Lake Mead.

Some 4½ or 5 miles across the lake to the north of Bonelli, on the Nevada shore, is Debbie's Cove ("the Cove"). There are two inlets in the Cove, parallel and running north and south. The Cove is in an area without any vegetation except some widely scattered bushes. The land side is rocky and gravelly, with outcrops of pure gypsum. The Cove is not accessible by vehicle on land. It is difficult to approach even on foot and is one of the more isolated sections of the shoreline.

In the early morning of May 25, 1977, Mike and Pat, in the pick-up truck, arrived at Temple Bar on Lake Mead. Pat let Mike out and continued in the truck to Bonelli. Mike was the first person to rent a boat at Temple Bar that day. He was alone. He said he had to meet someone at Bonelli and wanted to rent a boat. He had no fishing gear and said nothing about fishing. The boat rental ticket was written up; identification was required and Mike gave a driver's license. Mike's name was shown on the ticket. Mike told the boat manager that he was in the banking business in Phoenix.

---

1. The testimony of the husband had been given at a pretrial hearing and because he died short-ly before trial, his prior testimony was read to the jury.

.

The manager went to the boat dock with Mike, put the gas tank and other equipment in the boat, and saw Mike get in the boat alone and leave for Bonelli.

Meanwhile there had been a search for the missing van and the missing guards. A helicopter was dispatched at daylight on May 25, and shortly after six o'clock, the crew spotted the Purolator van near the Bumble Bee exit. After landing, the crew found no one in or near the van. No significant evidence was discovered in or around the van.

At Lake Mead, between 1:30 and 2:00 o'clock in the afternoon of May 25, Mike returned the boat to Temple Bar. With him was a companion. While the boat manager could not identify him, it was undisputed that Pat was the companion. They told the boat manager that their truck was stuck at Bonelli and that they needed somebody to pull them out.

After some inquires, Mike learned that, among a few others, an old acquaintance named Stan operated a tow service and gasoline station on Highway 93. Still in the afternoon of May 25, Mike telephoned Stan, who agreed to meet Mike at Temple Bar and pull out the truck stuck at Bonelli. At Temple Bar, Stan met Mike and another man who was introduced as Mike's brother "Jerry." While Stan could not identify "Jerry" in court, there is no doubt that he was Pat. The three went in Stan's tow truck to Bonelli, where Stan saw the truck stuck in the sand on a slant in shallow water some 400 yards from Bonelli itself. The Poland truck was backed into the water about ten feet; the tailgate was down and the water was up to the tailgate. The bed of the truck looked as if something had been dragged off it; on the bed was white, gravel-like sand. When Stan asked how the truck got stuck, Mike and Pat told him "they got feeling pretty good and they decided to come down there and carouse around a little bit around the lake."

At about 5:15 p. m., they were finished pulling the Poland truck out. Mike and Pat decided to go with Stan to his gas station and buy gas for the truck. They drove in the Poland truck and Stan followed them in his tow truck. On the way they stopped, Stan made out a ticket for his charges of $93.60, Mike gave him a $100 bill in payment, and Mike told Stan to keep the change. Mike was shown on the record as the customer. The two vehicles continued on to Stan's station, Mike bought gas, and he and Pat then left in the truck.

In the evening of Thursday, May 26, or in the morning of Friday, May 27, Pat returned the pick-up truck to his father. He did not return his father's tarpaulin; in its place he brought a brand new tarpaulin. He explained that they had torn up the old tarpaulin using it under the rear wheels to try to get out of some sand where they were stuck.

## 8.

At about nine in the morning of Thursday, June 16, a visitor in a boat discovered the body of a man—later identified as one of the guards—in shallow water at the Cove. The upper part of the body was encased in a canvas bag, pinning the arms to the sides. Law enforcement officers observed that a Sam Brown Belt with an empty pistol holster was on the body.

The canvas bag that covered the upper part of the body was one of the three such bags bought by Pat in April 1977 from a Phoenix company. The manager of the company made a positive identification.

Later on the same day, in the water near where the body had been found, divers located two uneven pieces of wood tied together with several pieces of green and white cord. This cord or rope was the Rover Rope that had been bought by Pat in April 1977. The rope was identified by the company manager who remembered how and why his company had purchased that distinctive rope. A representative of the manufacturer of Rover Rope also identified the rope and testified that it was made exclusively by his company (intended for dog leashes; hence the name) and that it was sold exclusively to the Phoenix company.

On the morning of June 23, officers found the other guard's body along the west shoreline of the Cove, about 100 yards from where the first guard's body was found. On the next day—June 24—divers searched the Cove. About three or four feet from shore they found a canvas bag on the bottom, with brass grommets and a green and white rope. This bag was one of the three such bags bought by Pat in April 1977 from the Phoenix company. Again the manager of the company made a positive identification.

On the affidavit of an FBI Special Agent, search warrants were issued by Judge Copple on July 26, 1977.

Some of these warrants were executed on July 27, 1977, by a search of Mike's house in Prescott, of his person, and of the car he was using. Among other things, there were found in these searches: (a) $13,313.50 in currency, including $1,000 in $100 bills; (b) $15 in paper wrapper rolls of coins; (c) an eight channel scanner for short wave or FM radio (this is a scanner additional to that bought for the same purpose by Pat in February 1977) set to select eight channels, five of which were Phoenix police channels and three of which were Arizona Department of Public Safety channels, one of these being used in the Bumble Bee turnoff area; (d) a Smith & Wesson .357 handgun with holster and belt; (e) a number of other handguns, rifles, shotguns, and other weapons; (f) two handcuff cases of the type used by law enforcement officers, with a black leather zap (a "zap" is a lead or heavy steel object covered with black leather, used by police officers for various purposes; including control of crowds; and (g) a receipt for a taser weapon from Western Heritage Gun Shop in Tucson in the name of Mark Harris.

Other warrants were executed on July 27, 1977, by a search of Pat's residence in Phoenix. Among other things, the officers found a leather identification case consisting of a law enforcement officer badge wallet. They found $15,225 in a red plastic shopping bag inside a woman's hair dryer in a closet of the master bedroom. They also found $630 in a wallet and $85 in a chest of drawers; this money was in $50, $20, and $5 bills.

On August 15, 1977, divers returned to search underwater at the Cove near where the bodies were found. They saw and brought up a canvas bag containing tarpaulin and a blanket. The canvas bag had deteriorated to such an extent that when it was picked up in the water it came apart. The bag was one of the three such bags bought by Pat in April 1977 from the Phoenix company. The tarpaulin was the tarpaulin that had been borrowed by Mike and Pat on May 24 from their father and not returned to him. No positive identification was made of the tarpaulin found in Lake Mead. The evidence, however, would compel a finding, which the jury undoubtedly made, that it was the tarpaulin borrowed on May 24 by appellants from their father. The fact of its being found in one of the canvas bags bought by Pat is itself strongly probative. The Polands' father testified that the size, shape, color, holes, abrasions, and location of grommets of the tarpaulin found in Lake Mead were the same as, or closely similar to, the tarpaulin he loaned to Mike and Pat on May 24; he testified that he could not say that the found tarpaulin was, or was not, his tarpaulin. An expert testified that he examined the tarpaulin found in Lake Mead and that he saw on it small gray particles which on analysis were high in calcium carbonate and gypsum. From this and from their microscopic characteristics he concluded that the particles were "neat cement such as comes out of a bag." His findings were consistent with the use of the tarpaulin to cover bags of cement to protect them from rain.

On the same day, the divers made another underwater trip and underneath where the canvas bag had been they found and brought up a license plate (folded over) and two handguns wrapped in tape. The plate turned out to be one used as distinctive identification by Arizona Department of Public Safety patrol vehicles; the two handguns were shown to have belonged to the driver-guards. The divers also found at the place where the bag had been several

rocks that they concluded had been placed in the bag; they were all of about the same size, that of a softball; nearby was a pile of similar rocks. All the rocks just described were distinctive in that they did not have silt or sediment on them, unlike the other rocks and objects on the bottom which were covered with silt or sediment. The only logical explanation for these two piles of rocks is that they were put in the canvas bags on the bodies to hold them down, and came out of the bags while submerged, thus allowing the bodies to rise and float.

Everything found by the divers in the Cove on August 15 was near where the bodies had been found, that is, within a distance of 200 to 300 feet.

9.

Soon after the May 24, 1977 robbery and murder, Mike and Pat appeared to have lots of cash money to make purchases, to pay off debts, and to obtain medical and dental services. This is in sharp contrast to their generally poor financial condition before May 24, 1977.

The spending by Mike and Pat together after May 24, 1977, up to the end of the year amounted to something over $83,000, nearly all of it in cash. When the money found in their houses during the searches on July 27, 1977 is added to this amount, they are shown to have been in possession, shortly after the robbery, of over $110,000 in cash.

10.

When the search warrants were executed on July 27, 1977, Mike at Prescott and Pat at Phoenix answered questions of the officers. They admitted being together at Lake Mead on May 25, 1977, in their father's truck and getting stuck, but their explanations of the reasons for their going to Lake Mead were completely inconsistent. Mike said that they went to Las Vegas to deliver raw turquoise for money, then decided to get their families to meet them at Lake Mead for fishing and an outing, then the truck got stuck, and they called off the family holiday. Pat on the other hand denied that they had gone to Las Vegas before Lake Mead and said nothing about a family outing; according to Pat, they did not go to Las Vegas because they were not dressed for it; their visit to Lake Mead "was a goof-off trip" and they were drinking heavily.

In their testimony, Mike and Pat tried to explain their activities in and prior to May 1977 by tales of drug and jewelry transactions. According to them, the cash came from these activities. No part of their story could be substantiated because, they claimed, their activities were illegal and they were dealing with evil and desperate characters who would inflict great injury on their families if they revealed any information about the drug or jewelry transactions. The jury was amply justified in rejecting their testimony as completely false.

The lengthy review of a good part, but not all, of the evidence, then, establishes the guilt of the appellants beyond any doubt. The combination of circumstances cannot be explained as coincidence.

The principal trial errors are thus claimed in respect of convictions where the evidence was not closely balanced but was powerfully demonstrative of guilt.

11.

Counsel for Pat Poland advance as their principal argument that Pat is "entitled to a reversal and new trial due to the misconduct of the trial judge." Counsel for Mike do not discuss such an argument but join in "any arguments" made by Pat.

The "misconduct" of the trial judge is said to consist of interruptions of defense counsel, impatience toward defense counsel, and sarcasm at the defendants' expense. The claim seems to be that a critical attitude toward defense counsel would prejudice the defendants.

Appellants stress statistics. They claim that there were 907 interruptions of defense counsel as contrasted with 168 interruptions of government counsel. The numbers themselves are of no significance because the interruptions of defense counsel were proper. It is not suggested that the trial judge should have interrupted govern-

ment counsel more often; no instance is given where the trial judge should have admonished government counsel and failed to do so. Furthermore, statistics must be considered in the context of the length of the trial. The record contains over 4,500 pages of trial transcript. The trial took all or a part of five consecutive weeks with testimony from 153 witnesses.

We are cited to some 41 examples of the alleged judicial trial misconduct. We have studied the record as to each, and find no reversible error.

Some of these are based on a mistaken reading of the record. For example, appellant argues that when the court denied Pat's counsel's request for a short recess because counsel was hoarse, the court "conveyed to the jury that the attorney had tried to deceive him" about the hoarseness. In fact, in denying the request in the presence of the jury, the court carefully used only the one word: "No" (25 RT 4409).[2] It was only later, after the jury was excused, that the court used the expressions to which objection is now made and this was done, as the record clearly recites, "outside the presence of the jury" (25 RT 4416).

Many of the examples cited represent an exaggeration and a too thin-skinned reaction to a perfectly normal inquiry by the court. A witness was asked by defense counsel if he would receive "a direct oral communication from the driver of the car." The court asked counsel: "What is a direct oral communication?" (4 RT 177). It is argued here that this was "an erroneous implication that defense counsel was using tricky language to put something by the jury." We are unable to find any such implication. The witness was dealing with messages between the Purolator van out on the highway and Purolator headquarters in Phoenix. In this context, the expression "direct oral communication" is puzzling and the court's question seems entirely natural. Indeed, such was the reaction at the time of defense counsel who remarked to the court:

"That's a fair question, your Honor" (4 RT 178).

On some, but not many, occasions the trial judge asked questions of a witness and these are brought now to our attention. We do not find these questions improper; on the contrary, they were calculated to make the testimony clearer to the jury. A government witness, for example, was asked by defense counsel if he had had an opportunity "before coming here to trial" to discuss the transaction with another government witness who had immediately preceded him on the stand. The answer was: "We had the opportunity, yes" (14 RT 1977). Defense counsel dropped the subject with this answer, leaving the jury with the possible impression that the two witnesses had a discussion just before coming to the Courtroom. Questions by the court brought out that the discussion to which the witness was referring took place some two and a half years before the trial. Such questioning by a trial judge cannot be the basis for proper criticism.

After winnowing the various examples to which appellants point, we are left with a number of instances in which the trial judge undeniably showed some impatience and irritation with defense counsel (and perhaps in a very few instances with appellants when they were testifying) and employed varying degrees of sarcasm in his expressions. Some of these may be seen at 4 RT 206, 5 RT 267, 5 RT 367–9, 8 RT 1043, 9 RT 1483, 17 RT 2572, 17 RT 2634–5, 22 RT 3677, and 23 RT 3937. In most, if not all, such instances the action of the trial judge is understandable and generally provoked by defense counsel. For example, defense counsel, at 5 RT 367–9, asked to approach the witness during the witness' direct examination by the Government. The judge replied: "God, counsel, I can't hold you back," and asked him to be seated. But this had been preceded by a request of the court to government counsel to examine certain photographs for identifying num-

2. The Reporter's transcript will hereafter be referred to as "RT"; the volumes of RT do not bear the same numbers in this court as in the court below; the volume numbers used herein are those employed in this court.

bers, by a request of defense counsel for leave to object, and by a ruling of the court that defense counsel should wait until the identifying numbers had been found. It was disregard of these instructions that brought on the words of the court to which objection is now made.

Viewed against the very long record of testimony, the number of incidents to which objection can reasonably be made is not large. Furthermore, the content of the expressions of the trial judge does not imply any opinion by him about the credibility of witnesses or the guilt of appellants. The jury instructions were explicit in this regard:

> Now, ladies and gentlemen, I on a number of occasions interrupted and asked a witness a question or perhaps more than one. I did this only for the purpose of clarification and to expedite matters. I did not intend to suggest by my questions that I had an opinion as to the guilt or innocence as to either defendant. I have no opinion one way or the other. In fact, if I did, I would be encroaching on your job.
>
> I also ruled on questions of law, overruled objections sometimes and sustained objections other times. That's part of my job, and you should draw no inferences because of any of my rulings. It is my duty also to admonish an attorney who out of zeal for his cause does something which is not in keeping with the Rules of Evidence or procedure. You are to draw no inference against any side to whom I did admonish.

■ Whatever the justification, however, it is an important principle that, especially in a criminal case, displays of irritation and the use of sarcasm by a trial judge should be avoided; it would have been better had they been avoided here. The risk is that in this delicate and sensitive area an appearance of partisanship by the trial judge may affect the attitude of the jury toward the defendants. Nonetheless, we are satisfied on this record that these appellants were not prejudiced by anything said or done by the trial judge; this was not a close decision

for a jury to make. Even if the statements of the trial judge were considered to be error, the evidence of guilt of these appellants was far too strong to allow the verdict to be affected by any impatience, irritation, or sarcasm of the trial judge.

### 12.

Appellant Mike urges that there was error in the exclusion of the testimony of Vance to what Sylvia Brown had told him. Appellant Pat adopts these arguments.

Sylvia Brown was a convicted felon in prison at Houston. She was brought to Tucson during the trial, at the request of the defendants. The court appointed counsel for her. The court was then advised that she would invoke the fifth amendment. Some effort was made to force the Government to grant her immunity. The court declined to order that she be granted immunity, and this decision is not questioned here.

Vance, a private investigator for defendants, was then offered as a witness to relate what Brown had told him about the crime. Appellants claimed that Brown's statements would inculpate her and exculpate them, and that Vance could testify because her statements to him were "against interest" under Fed.R.Evid. 804(b)(3) and thus were admissible as an exception to the hearsay rule. The court excluded this testimony by Vance.

■ Brown's statements are not relevant. She does not exculpate the appellants because she was not present when the crimes were committed. She claims to have heard plans made by two persons she knew with four persons she did not know. For all that appears, these two appellants may have been among the four planners not known to her.

Assuming her statements to be relevant, were they admissible as a declaration against penal interest under Fed.R.Evid. 804(b)(3)? As background, it should be remembered that her statements would have been excluded in federal courts before July 1, 1975 when the Federal Rules of Evidence

became effective. *Donnelly v. United States*, 228 U.S. 243, 272–77, 33 S.Ct. 449, 459–461, 57 L.Ed. 820 (1913). A declaration against interest meant *pecuniary* interest, not penal interest. While the distinction may not have been logical, it can be explained by the suspicion that a declaration against penal interest, offered by a defendant in a criminal case, was usually fabricated. This also explains why Fed.R.Evid. 804(b)(3) requires that there be "corroborating circumstances" that "*clearly* indicate the trustworthiness of the statement" (emphasis supplied).

■ Whether to admit a statement against penal interest is in the discretion of the trial judge. "The standard for appellate review of a decision to exclude a hearsay statement under Rule 804(b)(3) is whether the trial court abused its discretion." *United States v. Satterfield*, 572 F.2d 687, 690 (9th Cir.), *cert. denied*, 439 U.S. 840, 99 S.Ct. 128, 58 L.Ed.2d 138 (1978).

The statement of Sylvia was not a confession of any crime by her, nor did she say that she actually did anything criminal. She was present at planning. Her statement is that of an observer, not a participant. On the basis of her statement, the *most* that she did was to conspire and there is little evidence of that. All she says she did was to give Severson a false identification card in the name of Harris, but she does not relate that to any use of the card nor to any object of the conspiracy, nor to any knowledge on her part of what the card would be used for. In other words, her statement is not "solidly inculpatory" of her. *See United States v. Hoyos*, 573 F.2d 1111, 1115 (9th Cir. 1978).

There is no clear indication of the "trustworthiness" of Sylvia's statement based on "corroborating circumstances." It is not made spontaneously on her part; to the contrary, it was made over a year and a half after the crime. There was nothing to corroborate her statement that she was present when the crime was planned and her statement was not made to a family member, close friend, or someone to whom admission of a crime might be natural. In-

stead, it was made during the actual trial of defendants, to a person unknown before to Sylvia, but known by her to be employed as a private investigator by defendants. The statement of Sylvia to Vance was her third different version of the crime, each inconsistent with the others. Moreover, the details she here related—on which appellants naturally rely as corroborative—such as the canvas bags, uniforms, etc., were not in her September 1977 version and, as the Government persuasively argues, could easily have been learned by her from the new. media, especially after the August 1978 hearings. Because there is not only an absence of corroboration but also positive evidence that further shows untrustworthiness—such as evidence of drug addiction, a bad criminal record, psychiatric problems, and emotional disorders—we conclude that no abuse of discretion is shown in the ruling made.

### 13.

Both appellants ask reversal because the trial court admitted as "former testimony" (Fed.R.Evid. 804(b)(1)) the testimony of William Acker given at a motion hearing before trial.

William Acker and his wife were driving north from Phoenix on Highway 17 on May 24, 1977. Near the Bumble Bee turnoff they saw the Purolator van parked off the highway and a man standing by the door on the driver's side. When they learned of the crime involving the Purolator van, they told the FBI what they had seen. Acker went to a line-up at the request of the FBI and identified defendant Pat as the man he saw beside the van on May 24.

On July 14, 1978, defendant Mike moved "to suppress in-court identification." On August 3, 1978, defendant Pat joined in this motion. The motion was heard on August 8, 9, and 10, 1978. Acker testified at the motion hearing on August 9, and was cross-examined by counsel for the two defendants. On August 10, Judge Copple denied the motion, finding that "the line-up was fair and not unjust."

Acker died on December 18, 1978. On December 30, 1978, the Government filed a

motion to admit at the trial the testimony of Acker at the motion hearing, as stenographically transcribed. The Government's motion was argued to Judge Murphy on January 17, 1979, and was granted by him on January 18. Acker's testimony was thus admitted at trial.

The issue is governed by Fed.R.Evid. 804(b)(1), which admits the former testimony if the party against whom it is offered (here, the two appellants) "had an opportunity and *similar motive* to develop the testimony . . ." (emphasis supplied).

▉▉▉▉ Appellants contend that the motive for defense cross-examination at a motion to suppress hearing is not similar to the motive for cross-examination at trial. No authority is cited for the contention and the Government cites no authority in opposing it. On the facts here, however, the motive for defense cross-examination would have been the same in both cases. An eyewitness identification is not admissible at trial if it follows a pretrial identification, the procedure being "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The interest of the defense at a pretrial suppression hearing is not limited, however, to whether the procedure was suggestive. Even if the procedure is suggestive, the identification is nevertheless admissible if reliable. The defense must show not only that the procedure was suggestive but also that the identification was not reliable. The "central question" is "whether under the 'totality of circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). Therefore, at a suppression hearing the defense would have a strong motive to show whether the witness was drinking when the observation of the crime was made, how far away he was from the person observed, what his "eyesight may be like," etc.—all the questions suggested by Mike's counsel as advisable at the trial but not at a motion to suppress hearing.

We believe that the admission of Mr. Acker's recorded "former testimony" was proper.

14.

Both appellants ask for reversal on the ground that the search warrants were invalid, that denial of their motions to suppress was error, and that receipt into evidence of items seized under the invalid warrants caused them serious prejudice.

On July 26, 1977, Judge Copple issued several search warrants on the basis of the same affidavit of FBI Agent Oitzinger, sworn to before Judge Copple on July 26, 1977, including warrants for a search of the persons of Mike and Pat and for the premises where they then lived. On July 27, 1977, the search warrants were executed and many items said to be evidence or "fruits of the crime" or both, were seized. Some of these items were received in evidence at the trial when offered by the Government.

On May 25, 1978, Magistrate Gormley issued a warrant for a search of a house in Prescott where Mike then lived for taser weapons. This was on the basis of an affidavit of FBI Agent Mowrey, sworn to before the Magistrate on May 25, 1978. The warrant was executed on May 25, 1978, and a taser weapon was seized.

On July 14, 1978, a motion was filed for Mike to suppress as evidence the items seized under the described search warrants. On July 17, 1978, Pat filed a motion to suppress the items seized under the described search warrants. At the same time, Pat filed a notice that he joined in Mike's motion to suppress.

On August 18, 1978, the motions to suppress were argued to Judge Turrentine who concluded that the affidavits were sufficient and the warrants valid. On August 28, 1978, an opinion and order of Judge Turrentine were filed, denying the motions to suppress.

It is not questioned that the affidavit showed probable cause to believe that a crime was committed by Mike and Pat. The only issue raised here is that there was

no sufficient indication why the items to be searched for were expected to be on the persons or premises to be searched.

■ The affidavit of the FBI Agent did not connect Mike and Pat to each of the premises sought to be searched, the places where they were living, vehicles they had driven, a vehicle rented by their father that they had driven from time to time, and warehouse space leased by them. Although it is true that the affidavit contains no direct evidence to show that the items sought were to be found in the places to be searched, the existence of probable cause is not thereby affected. This court has already ruled on that point in *United States v. Pheaster*, 544 F.2d 353, 372–73 (9th Cir. 1976), and *United States v. Spearman*, 532 F.2d 132 (9th Cir. 1976), where we held that direct observation was not necessary and that normal inferences about where criminals would be likely to hide property were deemed sufficient, taking into account the type of crime, the nature of the items, and the opportunity for concealment.

Mike's contention that the currency could not have been expected to be in his or Pat's home because "people rarely keep large amounts of money at home for the simple reason that it does not draw interest" seems especially misguided. Of course, this would be true as to currency legitimately obtained. But Mike and Pat had been unemployed, without funds, borrowers, and in debt for living expenses. What could have aroused more suspicion or drawn more attention to them than large bank deposits after the robbery in order to "draw interest?"

The motions to suppress were properly denied and items seized under the warrants were properly admitted in evidence.

A number of other arguments have been pressed upon us for one appellant or the other. These have been studied by us but they do not have sufficient merit to warrant discussion.

AFFIRMED.