**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SECURITIES AND EXCHANGE
COMMISSION,
           *Plaintiff-Appellee,*

      v.

CARL W. JASPER,
           *Defendant-Appellant.*

No. 10-17064

D.C. No.
5:07-cv-06122-JW

OPINION

Appeal from the United States District Court
for the Northern District of California
James Ware, Chief District Judge, Presiding

Argued and Submitted
March 13, 2012—San Francisco, California

Filed May 15, 2012

Before: J. Clifford Wallace, Dorothy W. Nelson, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea

**COUNSEL**

J. Scott Ballenger, Latham & Watkins, Washington, DC, for the defendant-appellant.

Dominick V. Freda, Securities and Exchange Commission, Washington, DC, for the plaintiff-appellee.

## OPINION

BEA, Circuit Judge:

Defendant-Appellant Carl W. Jasper is the former Chief Financial Officer (CFO) of Maxim Integrated Products, Inc., a publicly-traded semiconductor company based in Silicon Valley. Following revelations that the company had issued backdated stock options without properly expensing them,[1] the SEC instituted this civil enforcement action against Jasper, alleging that Jasper violated various provisions of the securities laws.

The case proceeded to a seven-day jury trial; the jury found in favor of the SEC on most counts. As a result, the district court permanently enjoined Jasper from future violations of the same provisions of the securities laws, barred him from serving as an officer or director of a publicly traded company for two years, and imposed a civil penalty of $360,000. The court also ordered, pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 ("SOX 304"), *codified at* 15 U.S.C. § 7243, that Jasper reimburse Maxim for about $1.8 million in bonuses and profits from the sale of Maxim stock that Jasper received during the period that he certified Maxim's false financial statements.

Jasper appeals on three grounds. First, he contends that the district court made several evidentiary errors that require reversal. Second, he contends that the SEC's lawyers committed misconduct during the trial that requires reversal. Third, he contends that the reimbursement order pursuant to SOX 304 violated his Seventh Amendment right to a jury trial in civil cases. We affirm the district court in all respects.

---

[1]We include as Section I a background on the practice of stock options backdating.

I.

*Background on Options Backdating*

The gravamen of the SEC's complaint in this case is the allegation that Jasper "engaged in a scheme to illegally backdate stock options granted to Maxim employees and directors, concealing millions of dollars in expenses from investors and significantly overstating the Company's income." Thus, before turning to the facts and history of this case, we briefly explain the practice known as stock "options backdating."

A stock option grants the recipient "the opportunity to purchase a certain number of shares of company stock at a given price [called the 'exercise price'] on or after a predetermined date." *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1093 (9th Cir. 2011). The recipient may exercise the option by purchasing stock from the company at the exercise price, and he is then free to sell the same stock at its current market price. If the option is issued at an exercise price equal to the current market price, the option is referred to as having been issued "at the money." Conversely, an "in the money" option is issued at an exercise price that is lower than the current market price. This latter type of option is "in the money" because it is immediately profitable: the price at which the stock may be bought is lower than the price at which it may be sold. Last, an "out of the money" option is issued at an exercise price that is higher than the current market price. Perhaps needless to say, none of the options at issue during trial were either "at the money" or "out of the money."

During the time period relevant to this case, "at the money" and "in the money" options were treated differently for accounting purposes pursuant to generally accepted accounting principles (GAAP). For "in the money" options, "accounting principles require the company to record an expense for the [option recipient's] 'profit,'" — *i.e.*, the difference between the exercise price and the market price of an "in the

money" option is "treated as compensation to the option recipient over the vesting period." *Id.* This is because the company could have sold its treasury stock at the market price, rather than grant an option on such stock to another. If the company does grant an option at a price below market, it is transferring a potential company profit to the option recipient. The difference between exercise price and market price must be added to the firm's costs, usually as "employee compensation," since the option recipients are usually employees.

Backdating of options occurs when the company official responsible for administering a company's stock option plan monitors the price of the company stock and awards an "at the money" stock option grant as of a certain date in the past when the share price was lowest. *Id.* This "lock[s] in the largest possible gain for the option recipient" but also does not require the company to recognize as an expense the difference between the backdated exercise price and the market price of the stock as of the "legitimate" date of the option's award. *Id.* This practice is therefore "akin to betting on a horse race after the horse has already crossed the finish line." *Id.* Backdating options is "not in and of itself improper under the law or accounting principles," but it often leads to violations of the securities laws because "[i]f the company does not properly record the back-dated options, then the company's reported net income is overstated for each of the years the options vest, potentially deceiving the market and investors." *Id.* That is what the jury found occurred here.

## II.

We relate the facts here in the way most favorable to the jury verdict. *United States v. Hicks*, 217 F.3d 1038, 1041 (9th Cir. 2000).

## A.

Maxim is a semiconductor company listed on the NAS-DAQ stock exchange. It is therefore required to file with the

SEC Form 10-Q quarterly reports and Form 10-K annual reports, both of which must include audited financial statements, prepared in accordance with GAAP. *See* 15 U.S.C. § 78m. From 1999 until 2007, Jasper was Maxim's Principal Accounting Officer, CFO, and Vice President, and he was responsible for Maxim's accounting, including the accuracy of its financial statements and internal controls. During that time, Maxim's CEO, Jack Gifford, served as the "interim option committee" and had sole authority to grant stock options to directors and non-officer employees. Approximately seventy percent of Maxim employees received stock options when they were hired or as part of an annual review process.

The evidence showed that, from 2000 through 2005, Maxim employees and officers, including Jasper, regularly backdated stock options granted to employees and directors, and that they created false paperwork to conceal the true grant dates for those options. For instance, for ten consecutive quarters, Maxim granted backdated options with an exercise price equal to the lowest price of Maxim stock for each quarter. Sheila Raymond, the manager of Maxim's stock administration program, testified that in that time period "[t]he processes at the company, the way the company worked was to grant options at the lowest possible price without taking . . . expense for it."

In September 2006, following an internal investigation prompted by an analyst's report, Maxim announced that it was unable to file timely periodic reports because of the backdating investigation. In January 2007, both Jasper and CEO Gifford resigned. After a lengthy investigation, on September 30, 2008, Maxim announced that "[p]reviously filed financial statements for our fiscal years ended in 1997 through 2005 . . . should no longer be relied upon," and that earnings for those years had to be restated. In the restated document, known as the 2006 10-K, Maxim disclosed an $838.3 million reduction in its pre-tax income for the period 2000-2005,

which resulted primarily from the inclusion of $515 million in additional pre-tax expenses incurred as a result of stock-based compensation. Of the $515 million in misstated compensation expenses, the SEC's expert accountant testified that Maxim's operating income for fiscal years 2003, 2004, and 2005 alone had been overstated by a minimum of $135 million and as much as $357 million due solely to failure to recognize the true expense of unrecorded, backdated stock options.

Jasper was the CFO of Maxim during this entire period, and, on appeal, he does not dispute his knowledge of or involvement in this fraudulent scheme. Perhaps that is because the evidence is overwhelming. To take one specific example: the record shows that in late February or early March of 2003, when Maxim stock was over $30 per share, Jasper sent a memorandum to CEO Gifford proposing that to "ensur[e]" that a certain employee "stays with Maxim," Gifford should "grant [the employee] an option now at the Oct price so that he gets a favorable price." The employee received an "at the money" options grant backdated to October 9, 2002 with an exercise price of $21.35. Because of the roughly 50% increase in the company's stock price between October 2002 and March 2003, the grant was immediately profitable for the employee, and therefore truly a company expense for employee compensation, but the difference between $21.35 and $30.00 per share was never recorded as a transfer of money otherwise readily available to Maxim.

Jasper signed all of Maxim's SEC filings in that time period. The filings all stated that Jasper had reviewed the 10-K or 10-Q in question, and that the filings all "fairly present in all material respects the financial condition, results of operations and cash flows of" the company and "do[ ] not contain any untrue statement[s] of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." Jasper himself received more than $2 million

in bonuses from 2000-2005 tied to the company's profitability, including year-over-year growth in stock price and earnings per share.

The case proceeded to a jury trial. The jury found that Jasper: 1) committed fraud in violation of 15 U.S.C. §§ 77q(a)(1), 78j(b), and SEC Rule 10b-5, *codified at* 17 C.F.R. § 240.10b-5, when he participated in a scheme to overstate Maxim's net income by failing properly to account for the issuance of backdated stock options; 2) aided and abetted Maxim's filing of materially false and misleading reports with the Commission in violation 15 U.S.C. § 78m(a); 3) aided and abetted Maxim's failure to keep accurate books and records in violation of 15 U.S.C. § 78m(b)(2)(A); 4) aided and abetted Maxim's failure to devise and maintain sufficient internal accounting controls in violation of 15 U.S.C. § 78m(b)(2)(B); 5) falsified Maxim's books and records in violation of 17 C.F.R. § 240.13b2-1; 6) made false statements or omissions to an accountant or auditor in connection with a required audit of Maxim's financial statements in violation of 17 C.F.R. § 240.13b2-2; and 7) signed false certifications included with Maxim's quarterly or annual reports in violation of 17 C.F.R. § 240.13a-14. The jury also found Jasper not liable on three counts.

As a result of the jury's findings, the district court permanently enjoined Jasper from future violations of the same provisions of the securities laws, barred him from serving as an officer or director of a publicly traded company for two years, imposed a civil penalty of $360,000, and ordered, pursuant to SOX 304, that Jasper reimburse Maxim for $1.8 million in bonuses and profits from the sale of Maxim stock that Jasper received during the period that he certified Maxim's false financial statements.

Jasper timely appealed.

## III.

### A.   The Evidentiary Rulings

Jasper's primary challenge on appeal is to three of the district court's evidentiary rulings. A district court's evidentiary rulings should not be reversed "absent clear abuse of discretion" and "some prejudice." *Jauregui v. City of Glendale*, 852 F.2d 1128, 1132 (9th Cir. 1988). The district court was within its discretion with all three rulings.

### 1.

In a pre-trial motion in limine, Jasper moved to exclude any mention of the 2006 10-K—which was actually released on September 30, 2008, long after Jasper had resigned as CFO in January 2007—in which Maxim restated its financial statements. The district court ruled the government could introduce the 10-K into evidence. The court said that, if properly authenticated at trial, the 10-K would be admissible under Federal Rule of Evidence 803(6)—the business records exception to the hearsay rule—because it was "a report made at or near the time of the accounting review by those with knowledge of Maxim's books," and "[t]he circumstances of its creation do not indicate that it lacks trustworthiness."[2] The district court admitted Maxim's 2006 10-K only after Alan Hale, Maxim's interim CFO during the restatement process, laid a foundation for its admission.

On appeal, Jasper contends that it was an abuse of discretion for the district court to admit into evidence the 2006 10-

---

[2]The business records exception is available where the record is "(1) made or based on information transmitted by a person with knowledge at or near the time of the transaction; (2) made in the ordinary course of business; and (3) trustworthy, with neither the source of information nor method or circumstances of preparation indicating a lack of trustworthiness." *United States v. Bonallo*, 858 F.2d 1427, 1435 (9th Cir. 2000) (internal citations omitted).

K, because it was hearsay and not admissible under Rule 803(6). According to Jasper, the 2006 10-K should not have been admitted into evidence as a business record because "[t]he restatement is not a record of historical facts prepared by people with personal knowledge, at or near the time of the events, who were just doing their ordinary jobs. It is the culmination of an extraordinary two-year investigation costing tens of millions of dollars, and represents the technical accounting conclusions prepared many years after the facts, by teams of outside investigators and accountants with no personal knowledge, using newly promulgated accounting guidance." Further, the preparation of the 2006 10-K "took place in a context of tremendous liability risk, and was explicitly created with an eye toward pending litigation."

**[1]** Jasper's argument fails. The 2006 10-K—like virtually all 10-Ks—was admissible as a business record so long as it was properly authenticated, which the 10-K here was. Jasper's error is in arguing that the restated 10-K was introduced as evidence of the state of mind of Jasper during the relevant time periods. It was not. Rather, as the district court found, it was introduced as a report made at or near the time *of the accounting review* by those with knowledge of Maxim's books. That is, the 2006 10-K is a business record of the accounting review itself, not of the misconduct that gave rise to the need for the restatement. It was a review of what the books of Maxim showed for the period of the stock options backdating, a comparison of the exercise price to the market price when the options were actually granted, and the consequent losses/expenses to Maxim. Thus, with regard to the detailed accounting review, the restated 10-K assuredly was "prepared by people with personal knowledge, at or near the time of the events, who were just doing their ordinary jobs." Framed this way, admission into evidence of 10-Ks restating prior earnings is a regular practice in the federal courts: the vast majority of district courts to have considered this issue have found restated financial reports to be admissible on precisely those grounds. *See, e.g.*, *In re Homestore.com, Inc.*, No.

01-11115, 2011 WL 291176, at *5 (C.D. Cal. Jan. 25, 2011); *In re WorldCom, Inc. Sec. Litig.*, No. 02-3288, 2005 WL 375313, at *6 (S.D.N.Y. Feb. 17, 2005).

In opposition to the government's position suggesting the admissibility of the restated 2006 10-K, Jasper relies heavily on a single Ninth Circuit case, *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1258 (9th Cir. 1984). In *Paddack*, this court held that a "special audit" commissioned because of suspected impropriety in past financial reporting was inadmissible as a business record. *Id.* at 1256-58. The "special audit" in *Paddack* was a report of a single accounting firm and the "accountants were not requested to undertake a traditional financial statement audit." *Id.* at 1257. The *Paddack* court stated that when "an accountant performs a financial statement audit in accordance with generally accepted auditing standards to express an opinion on the fairness with which the [financial statements] present financial position, results of operations, and changes in financial position in conformity with generally accepted accounting principles . . . it is it is generally admissible as a business record of the audited entity under Fed. R. Evid. 803(6)." *Id.* at 1257 n.3 (internal quotation marks and citation omitted).

**[2]** *Paddack* supports our conclusion. The record here shows that the restated 2006 10-K was a paradigmatic "financial statement audit" and not a "special audit." Alan Hale, the interim CFO who was in place during the filing of the 2006 10-K, testified as follows:

> Q: As a company that wanted to have its shares publicly traded, was Maxim required to prepare this annual report [i.e., the 2006 10-K]?
>
> A: Yes.
>
> Q: And as a company that wanted to have its shares publicly traded, was Maxim required to pre-

pare and provide to investors financial statements that complied with GAAP [i.e., generally accepted accounting principles]?

A: Yes.

Thus, because the financial statements in the 2006 10-K had to comply with GAAP, that document falls into the category of admissible "financial statement audits" under *Paddack*, not inadmissible "special audits."

[3] We also reject Jasper's contention that the 10-K "was explicitly created with an eye toward pending litigation" and therefore should have been excluded. This argument has no limiting principle: the filing of an accurate 10-K was and continues to be a legal requirement for Maxim. In today's litigation-heavy climate, the filing of any 10-K can *always* subject companies to legal exposure. That is why lawyers pore over 10-Ks every year at substantial expense to shareholders. Were this court to accept Jasper's contention, virtually every document a public company releases to the public would be inadmissable as a business record merely because companies are worried about litigation risks. That is not the law under the Federal Rules of Evidence.

[4] Jasper also contends that the 2006 10-K should be excluded as improper expert testimony under Rules 701[3] and 702[4] because of the accounting judgments involved. However,

---

[3]That provision states: "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

[4]That provision states: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other

even assuming the 2006 10-K contained expert opinion, it was not an abuse of discretion for the district court to admit it without affirmatively stating that the requirements of Rule 702 were satisfied because Rule 803(6) expressly provides for the exclusion of a business record if the source of information indicates a lack of trustworthiness. *See United States v. Licavoli*, 604 F.2d 613, 622 (9th Cir. 1979). Also, there is nothing in the record showing that Jasper objected to any failure to disclose the 2006 10-K's authors under Fed. R. Civ. P. 26(a)(2)[5] or was prejudiced by it. There was no plain error in not excluding the 2006 10-K on that ground. *United States v. Sioux*, 362 F.3d 1241, 1244 n. 5 (9th Cir. 2004) (plain error review proper when defendant did not "raise the specific objection he now presses").

**[5]** Finally, Jasper contends that the 2006 10-K's scant probative value was substantially outweighed by the danger of unfair prejudice under Rule 403[6] because it reflects an exercise of judgment under new accounting guidance, and because it encompasses more than just Jasper's charged conduct. However, the 2006 10-K is probative of the falsity of the previously filed documents and the magnitude of the corrections. That an exhibit contains ambiguities generally goes to the weight and not the admissibility of the evidence, *United*

---

specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

[5]That provision states, in relevant part, that: "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A).

[6]That provision states: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

*States v. Scholl*, 166 F.3d 964, 978 (9th Cir. 1999), and the SEC's expert testified to the amount of restated compensation expense that was attributable to Jasper's involvement in the backdating scheme.

**[6]** For these reasons, it was not an abuse of discretion for the district court to admit the 2006 10-K into evidence.

2.

In two particular circumstances at trial, the district court allowed the SEC to introduce evidence of Jasper's repeated invocation of the Fifth Amendment and instructed the jury that it could, but was not required to, draw an adverse inference from the invocations. The SEC introduced a videotape of Jasper's deposition, where Jasper repeatedly invoked the Fifth Amendment,[7] and the court also allowed the SEC to introduce written discovery responses in which Jasper invoked his Fifth Amendment rights an additional 150 times. The discovery responses contained exchanges such as:

> *Interrogatory No. 1*: From May 1, 1998 through January 31, 2007, please describe in detail the process by which OPTION GRANTS were made at Maxim, including, without limitation, the identification of all relevant people, documents, and COMMUNICATIONS.

---

[7]An example of an exchange in the videotape is:

Q: Can you tell us when you first became acquainted with Maxim Integrated Products?

A: On advice of counsel, I'm exercising my Fifth Amendment constitutional right to decline to answer that question.

Q: And can you tell us what your responsibilities were during your tenure at Maxim Integrated Products?

A: Yeah, on advice of counsel, I'm exercising my Fifth Amendment constitutional right to decline to answer that question.

And so on.

*Response*: Mr. Jasper declines to respond personally based on his rights under the Fifth Amendment to the United States Constitution, as described in his General Objections above. We refer the SEC, however, to Mr. Jasper's initial and supplemental disclosures under Federal Rule of Civil Procedure 26 and to the documents, testimony, and other information uncovered during discovery in this matter.

Both at the time of the evidence's introduction and at the close of evidence, the district court instructed the jury about the proper way in which it could use the evidence. For instance, following the close of evidence, the district court instructed the jury that "in civil cases, you are permitted, but not required, to draw the inference that the withheld information would have been unfavorable for the defendant. Any inference you may draw should be based upon all of the facts and circumstances in this case as you find them."

**[7]** The Supreme Court has previously stated that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). However, because there is some "tension between one party's Fifth Amendment rights and the other party's right to a fair proceeding," this court has held that there are certain limits on when a court in a civil case may give an adverse inference instruction that accompanies a witness's invocation of the Fifth Amendment. *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264-65 (9th Cir. 2000). In *Glanzer*, this court stated that the tension between the Fifth Amendment and the need for a balanced trial in a civil case is resolved by a careful balancing of interests. *Id.* at 1265. The *Glanzer* court said that courts should "analyz[e] each instance where the adverse inference was drawn, or not drawn, on a case-by-case basis under the microscope of the circumstances of that particular civil litigation. . . . In each particular circumstance, the competing interests

of the party asserting the privilege, and the party against whom the privilege is invoked must be carefully balanced." *Id.*

On appeal, Jasper does not object to the jury instructions, and, for what seems to be merely illustrative purposes, he registers one specific objection to the introduction of a particular statement of his and the accompanying adverse inference instruction.[8] Instead, Jasper criticizes the district court for supposedly "abdicat[ing] its responsibility to scrutinize the admissibility of these invocations, and the permissible inferences from them, on a question-by-question basis applying the multi-part test from *Glanzer* and *Nationwide* [*Life Ins. Co. v. Richards*, 541 F.3d 903 (9th Cir. 2008)]." According to Jasper, "[t]his was an abuse of discretion, if that discretion was exercised at all."

**[8]** While the admission of such a large number of Fifth Amendment invocations is unusual, we hold that the district court was within its discretion to admit them under these circumstances. Jasper has no legal support for the proposition that a district court must make its evidentiary rulings and tailor its adverse inference instructions on a "question-by-question basis." The best Jasper can do is cite this court's statement in *Glanzer* that "[t]he court must analyze 'each instance where the adverse inference was drawn, or not drawn, on a case-by-case basis under the microscope of the circumstances of that particular civil litigation.' " But Jasper has no warrant for treating every individual question as an "instance where the adverse inference was drawn" under

---

[8]Jasper contends on appeal that Interrogatory No. 1, which is reprinted in full above, is "so broad that it could not possibly support a properly confined inference under *Glanzer*." His point is difficult to grasp. Decanted from the arch phrases of litigation practices, the interrogatory in essence asks: "How were Maxim stock options given out? Tell us who was involved, and what paper trail they left." Why an inference could not be properly drawn from a refusal to answer this "whodunit" question is itself a mystery.

*Glanzer*. As properly instructed, the jury could have concluded that the sum total of his Fifth Amendment invocations supported the adverse inference against him.

Our conclusion is supported by the fact that, in district court, both parties generally treated each question-and-answer session in which Jasper invoked the Fifth Amendment as a single "invocation" of his Fifth Amendment rights. That is, Jasper, the SEC, and the district court treated *each round of questioning* as a single instance of his invoking the privilege, not hundreds of instances, as he now characterizes it on appeal.

Jasper filed an opposition to the SEC's motion in limine requesting that the deposition and written interrogatories be admitted into evidence, and also his own motion seeking to exclude the same evidence. The SEC's motion described at length the nature of the evidence the Commission wished to admit, and Jasper had access to the full transcripts of both sessions. Yet in neither document does Jasper single out any particular invocation in response to a question, along with an accompanying adverse inference, that would be improper. Instead, Jasper simply wanted to disable the SEC from using any of this evidence, and Jasper did not want the district court to issue any adverse inference instructions.[9] On appeal, however, he changes the level of detail, and he asks us to hold that each question-and-response is a single invocation which must

---

[9]The broad level of generality with which Jasper treated the Fifth Amendment invocations is illustrated perfectly by the sub-headings on one motion in limine in the district court. There, Jasper refers to "Jasper's First Invocation of the Fifth Amendment," which was a May 2007 interview containing many questions-and-responses, and "Jasper's Second Invocation of the Fifth Amendment," which was a September 2008 deposition. Thus, Jasper's request below that the district court require the SEC to "establish the admissibility, relevance, and reliability of *each Fifth Amendment invocation*," is most naturally read as a request that the district court look at each session, interview, or deposition in which Jasper invoked the Fifth Amendment, not each individual *question-and-response*.

be analyzed separately and, one supposes, give rise to a separate jury instructions regarding the proper adverse inference. But he has no warrant for changing the level of generality so dramatically on appeal.[10]

The district court also dealt with the evidence of invocation of the Fifth Amendment privilege at a high level of generality, and it instructed the jury to do the same. Before playing the videotaped deposition, the district court instructed the jury as follows:

Although you are permitted to draw a negative inference from the fact that the defendant asserts his Fifth Amendment privilege and silence in response to questions, you're not required to do so.

Now, because of the nature of this case, I might interrupt the playing of the videotape after I'm satisfied that you have had an opportunity to review the defendant and his invocation of the privilege.

In other words, we won't just allow [the SEC] to play it, and the point to play it just to have you hear it repeated multiple times. But it is permissible for them to play enough of it so that you can understand the nature [of] the questions to which the privilege was invoked.

**[9]** Thus, the district court properly considered the propriety of the Fifth Amendment invocations precisely as they were presented to the court by both sides: as a whole, with

---

[10]*Glanzer* observes that the "Fifth Amendment's protections against self-incrimination are invoked on a question-by-question basis." 232 F.3d at 1265. If so, then proper objection to proof of each invocation of the Fifth Amendment must also be made on a question-by-question basis. As noted, Jasper objected to proof of invocations in general: by the group, or the session.

inferences to be permitted as a whole based on "the nature of the questions to which the privilege was invoked." In these circumstances, and in view of Jasper's uniting his invocations into identified groupings of questions, it was not an abuse of discretion to treat the video and responses to interrogatories as general "instances" of Jasper's invocation of his Fifth Amendment rights, and then admit them into evidence and instruct the jury as such.[11]

3.

At trial, Jasper attempted to introduce into evidence hearsay statements given by Timothy R. Ruehle, the former treasurer of Maxim, as part of the early investigation of the backdating scandal. Jasper could not call Ruehle as a witness because by the time the parties' took Ruehle's deposition, Ruehle had become "unavailable" as a witness. *See* Fed. R. Evid. 804(a)(1).[12] Ruehle had invoked his Fifth Amendment right against self-incrimination; he continued to assert these rights through the trial.

---

[11]It is true that Jasper contended at one point below that "any adverse inference from an invocation of the Fifth Amendment must be drawn only with regard to a specific question." But Jasper there did not single out any objectionable question-and-response, along with the accompanying adverse inference instruction. Jasper had no warrant for requesting that the SEC justify its evidentiary admissions on a question-by-question basis without his stating which questions, responses, and adverse inferences would be objectionable unless so considered by the court. Under the Federal Rules of Evidence, proper objections to the admission of evidence must "state[ ] the specific ground" of the objection. Fed. R. Evid. 103(a)(1)(B). Since Jasper objected to no particular question-and-response in his motions in limine, it would have been logically impossible for the district court to know any "specific ground" of Jasper's objection to any particular question-and-response.

[12]The provision says that a "declarant is considered to be unavailable as a witness if the declarant: is exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies."

Jasper contended that Ruehle's earlier sworn testimony, taken in the course of a fact-gathering investigation by the SEC, would help exculpate Jasper. For instance, Jasper points to the following exchange that he contends would have bolstered his case:

> Q: Do you know whether Maxim ever did grant in the money options? . . .

> A: Right. I'm not aware of any time where, under the [options] plan, options were granted with an exercise price less than market price on grant date, no.[13]

Jasper contends this and other statements by Ruehle were admissible under Federal Rule of Evidence 804(b)(1), which excepts from the hearsay prohibition testimony "given as a witness at a trial, hearing, or lawful deposition" if the testimony "is now offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination."[14]

---

[13]This indeed seems a very careful statement. Did Ruehle mean as "grant date" the date 1) Maxim's books reflected the grant made (the backdated date), or 2) the *actual* grant date? Of course, the jury did not have the opportunity to decide.

[14]Careful readers may be asking whether Ruehle's prior sworn testimony during the SEC fact-finding investigation counts as testimony "given at a trial, hearing, or lawful deposition," which is the only kind of testimony potentially admissible under Rule 804. The district court flagged this issue when it stated that it "didn't know the circumstances as to whether [Ruehle] actually appeared before the Commission and gave sworn testimony to it or whether it was under other circumstances, but in any event he made statements that I'm told are sworn testimony." But the district court did not exclude Ruehle's statements on the basis that they were not "testimony" under the meaning of Rule 804, and neither party addresses that issue on appeal. Thus, we express no opinion as to whether that, too, would have been a proper basis for exclusion.

The SEC objected to the admission of Ruehle's testimony on the ground that it was inadmissible hearsay, and the district court found the testimony inadmissible for two reasons. First, the court ruled that "during the investigatory stage of the proceedings, as opposed to the accusatory stage of the proceedings, which is what the trial is, the motive is different." Further, "it was actually the SEC who sought to depose Mr. Ruehle in the litigation at which he invoked his Fifth Amendment privilege and refused to answer any of the questions that he was asked before." Second, in light of Ruehle's subsequent blanket invocation of the Fifth Amendment, the district court expressed concern that Ruehle's testimony was too unreliable to be admitted without the opportunity for cross-examination by the SEC. "Credibility is so important to this process," said the district court, "that it can sometimes go just to the completeness of testimony and not necessarily the incorrectness of it."

[10] The district court's exclusion of this testimony was not an abuse of discretion. Jasper does not directly address the district court's statement that the SEC had no opportunity, *at a point when the SEC had a motive similar to its motive at trial*, to cross-examine Ruehle. Instead, Jasper simply asserts that "the SEC had every opportunity and motive to cross-examine Ruehle during its own interview process." But that assertion does nothing to contest the district court's conclusion regarding the difference in the nature of the SEC's motivation during an early investigation, at which open-ended questions are typically asked without expectation the witness will be needed at trial, and its motivation at an adverse witness deposition, when battle lines have already been drawn and necessary witnesses identified.

[11] Moreover, the district court's finding that Ruehle's statements were unreliable in light of his subsequent invocation of the Fifth Amendment was not clearly erroneous, and was thus another permissible reason to exclude the sworn interrogation. Where hearsay statements would have been

admissible under Fed. R. Evid. 804(b)(1), the rule at issue here, our court noted that exclusion would *still* be proper if the "trial court simply considered it unfair to present a version of an unavailable witness' testimony without an opportunity to cross-examine directly." *United States v. Lester*, 749 F.2d 1288, 1301 (9th Cir. 1984). Under this rule especially, admission of evidence "is a matter for the trial judge's discretion, to be exercised on the basis of his evaluation of the realities of cross-examination and the motive and interest with which [one party] carried out the prior examination." *Id.* That is exactly what the district court did here, and we therefore affirm its decision.

## B.    Attorney Misconduct

Next, Jasper contends that a new trial is warranted because attorney misconduct permeated the proceedings. This contention also fails.

**[12]** To receive a new trial because of attorney misconduct in the civil context, defendants must meet a high standard: "the moving party must demonstrate adverse counsel's misconduct . . . 'substantially interfered' with the moving party's interest." *Cal. Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1405 (9th Cir. 1995). Further, "[t]o warrant reversal on grounds of attorney misconduct, the flavor of misconduct must sufficiently permeate an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." *Kehr v. Smith Barney, Harris Upham & Co., Inc.*, 736 F.2d 1283, 1286 (9th Cir. 1984) (internal quotation marks and citation omitted).

Jasper contends that statements made by the SEC on three issues in its closing argument were improper. We need not address each in turn, since, to prevail, Jasper would need to show the kind of pervasive misconduct that would "permeate an entire proceeding." He has not done so.

**[13]** In its decision denying Jasper's motion for a new trial, the district court summarized the reason that the misconduct claim fails:

> The Court finds that the SEC's conduct of which Defendant complains essentially amounts to a small number of isolated statements in lengthy closing and rebuttal arguments. The fact that the verdict was not in favor of the SEC on all of its claims demonstrates that the jury carefully weighed the evidence before it and did not merely presume Defendant's liability. Thus, even assuming the SEC committed misconduct during the trial, it was not of the kind or quality that would permeate the entire proceedings and taint the jury's verdict.

We have reviewed the claimed instances of attorney misconduct, and we agree with the district court's reasoning. No more need be said on the matter.

## C.   SOX 304

In addition to paying a civil fine, Jasper was ordered to reimburse Maxim for $1.8 million in bonuses and profits from the sale of Maxim stock that Jasper received during the period that he certified Maxim's false financial statements. This reimbursement was ordered pursuant to a provision known as "SOX 304." SOX 304 was passed in 2002 as part of the Sarbanes-Oxley Act, and it is codified at 15 U.S.C. § 7243.

SOX 304 provides, in relevant part:

> If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for—

(1) any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and

(2) any profits realized from the sale of securities of the issuer during that 12-month period.

The district court found that Maxim was required to restate financial statements originally issued in September 2002, 2003, 2004, and 2005 because of its material noncompliance with securities reporting requirements, and ordered that Jasper reimburse Maxim the bonuses Jasper earned during the 1-year period following each of those misstated reports according to SOX 304.[15] Jasper contends that the jury's verdict was not specific enough to support this finding because "the jury was never asked to consider whether Maxim was 'required' to restate its financials 'as a result of misconduct.' " To prevail on this argument, Jasper must establish that the remedy of reimbursement is a "legal" rather than an "equitable" remedy, since Jasper himself recognizes that he has a right to a jury trial only on any claim for relief seeking traditionally legal, as opposed to equitable, remedies. *SEC v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993). Jasper notes that "[f]orfeiture and penalties are legal remedies, as compared to equitable remedies like restitution, disgorgement, and injunctions."

Ninth Circuit law is clear that the reimbursement provision of SOX 304 is considered an equitable disgorgement remedy and not a legal penalty. Thus, Jasper is not entitled to have a jury find all of the facts necessary to support the reimbursement.

---

[15]SOX 304 does not apply to conduct that occurred before 2002.

**[14]** In *In re Digimarc Corp. Derivative Litig.*, 549 F.3d 1223 (9th Cir. 2008), we addressed the question whether SOX 304 creates a private right of action. *Id.* at 1231. The court undertook a detailed analysis of the nature of the provision by examining not only the legislative intent of SOX 304 but also how SOX 304 fits into the legislative scheme of Sarbanes-Oxley as a whole. *Id.* In holding that SOX 304 did not create a private right of action, the court examined the nature of the remedy available in SOX 304 and said that it "require[s] non-compliant directors and officers to reimburse the issuer by *disgorging* the profits of their noncompliance." *Id.* at 1232 (emphasis added). The court then explicitly noted that "disgorgement remedies are equitable." *Id.* at 1233. Finally, the court contrasted SOX 304 with other equitable provisions of Sarbanes-Oxley and stated that "we cannot find in Congress' silence in section 304 an intent to create a private right of action where it was not silent in creating such a right to *similar equitable remedies* in other sections of the same Act." *Id.* (emphasis added).[16]

**[15]** Because Jasper had no right to have a jury find all predicate facts to the remedy of disgorgement, the finding that Maxim was indeed "required" to restate those four earnings reports because of "misconduct" is viable whether or not it is characterized as having been made by the judge or upon the advice of a jury.

\* \* \*

---

[16]The discussion of the remedy of SOX 304 was not mere "dictum" in the *Digimarc* case, as Jasper contends it was. Rather, the comparison between SOX 304 and other specifically equitable provisions of Sarbanes-Oxley was crucial to the court's holding that SOX 304 created no private right of action. We are bound by the language in the *Digimarc* case. Jasper points us instead to a district court case from the Northern District of Texas which found that the remedy in SOX 304 was a legal one, *see SEC v. Microtune, Inc.*, 783 F. Supp. 2d 867 (N.D. Tex. 2011), but it goes without saying which of those two authorities we must follow.

Jasper was the CFO of a public company that was forced to restate hundreds of millions of dollars of its earnings, spanning nearly a decade, because Maxim regularly failed to record as compensation expenses stock options profits to option recipients. On appeal, Jasper does not challenge his involvement in this scheme in any way. He objects only to the procedures by which he was tried. Jasper, no less than anyone else, is of course entitled to be tried fairly. But, on reviewing the record, we conclude that Jasper received a full and fair civil trial in this enforcement action. A jury of his peers found against him on most counts, and the district court entered judgment against him. We leave that judgment in place.

AFFIRMED.