**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

RAYMOND IGNACIO DUENAS, Jr.,
          *Defendant-Appellant.*

No. 09-10492

D.C. No.
1:07-cr-00039-
DDP-1

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

LOURDES CASTRO DUENAS,
          *Defendant-Appellant.*

No. 09-10496

D.C. No.
1:07-cr-00039-
DDP-2

OPINION

Appeal from the United States District Court
for the District of Guam
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted
June 14, 2011—Honolulu, Hawaii

Filed August 16, 2012

Before: Arthur L. Alarcón, Kim McLane Wardlaw, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Wardlaw

## COUNSEL

Mark Eibert, Half Moon Bay, California, for defendant-appellant Raymond Ignacio Duenas, Jr.

Gretchen Fusilier, Carlsbad, California, for defendant-appellant Lourdes Castro Duenas.

Alicia Limtiaco, United States Attorney; Karon Virginia Johnson, Assistant United States Attorney; Hagatna, Guam, for plaintiff-appellee United States of America.

## OPINION

WARDLAW, Circuit Judge:

These consolidated appeals arise from the chaotic two-day execution of a search warrant by the Guam Police Depart-

ment's ("GPD") SWAT team, in coordination with federal DEA and ATF agents. The search resulted in one of the largest "busts" of stolen items in Guam's history. The "woefully inadequate" management of the search of Raymond ("Ray") and Lourdes ("Lou") Duenas's compound and the staging of the inventory of seized drugs and goods on the compound's front yard attracted members of the media and victims who came to claim their property while the two-day execution of the warrant was ongoing.

Ray and Lou were arrested and separately gave statements to police officers. The district court denied their motions to suppress evidence of the drugs and stolen goods seized in the raid and their statements. A jury convicted each of the Duenases on multiple counts. Both appeal their convictions, contending that the suppression motions should have been granted, that former testimony of by-then-deceased Officer Frankie Smith should not have been admitted at trial, and that there was insufficient evidence to support their convictions. Although the conduct of the search was highly questionable, given the participation of the public and the media, the district court did not err by deciding not to exclude the stolen items, drugs, and other paraphernalia found in the compound. However, the district court abused its discretion by admitting the former testimony of Officer Smith under Rule 804(b)(1) of the Federal Rules of Evidence, because it incorrectly concluded that defense counsel had a similar motive to cross-examine Officer Smith when it questioned him at the suppression hearing as it would have had at the trial. Because Ray's statement was admitted through Smith's former testimony, Ray's conviction must be reversed. However, we affirm Lou's conviction, as it was supported by sufficient evidence.

## I.  Factual Background

Ray and Lou lived on an isolated jungle property in Dededo, Guam, with Ray's mother, Ray's daughter, and another man. Ray's mother owned the property. A main house

and a shipping container faced the dirt road leading up to the property. Behind the house and container, toward the rear of the property, was a make-shift four-room shack in which Ray and Lou lived.[1]

At approximately 5:40 a.m. on April 19, 2007, GPD officers, along with DEA and ATF agents, executed a search warrant at the Duenases' residence for evidence of narcotics trafficking. Ray and Lou were asleep in the room dubbed "Lou room/Ray's room" when the officers entered the residence. The search scene was "almost chaotic," according to Guam Chief of Police Paul Suba. The district court characterized GPD's management of the scene as "woefully inadequate." Although up to forty officers were present, no single officer was clearly in charge of managing the scene. The testimony at trial demonstrated that members of the media and other civilians were allowed on the Duenas property during the search to film and photograph the scene. Journalist Eric Palacios testified that he arrived shortly after 9:00 a.m., following an anonymous phone call indicating that something was happening on Ysengsong Road, where the Duenases lived. Trina San Augustin, another journalist, testified that she too went to the Duenas property after receiving an anonymous call.

The media were instructed to remain in the front yard and were not permitted past the shipping container. Officers allowed the media to film and photograph stolen property as it was taken from the residence and surrounding structures and placed in a staging area in the front yard. GPD Officer Scott Wade escorted some members of the media down a jungle path to the rear of the property to view and photograph a marijuana patch. Officer Kim Santos said that she escorted Palacios further into the property "to where the SWAT officers were situated." Officer Allan Guzman testified that, in a

---

[1]Law enforcement agents termed the four rooms in this shack the "kitchen," "Lou room/Ray's room," "storage," and "drug room."

highly unusual departure from protocol, Chief Suba took some journalists on a tour of the scene so they could film the items being staged, with the hope that theft victims could thereby identify their stolen property. Officer Wade also testified that he held a press conference at the edge of the front yard.

The presence of members of the general public contributed to the chaos at the search scene. Numerous denizens of Guam came to the Duenas residence during the search to identify items that had allegedly been stolen from them. Some of these people touched the items in the staging area, and several claimed property, which was released to them at the scene. For example, one police officer was permitted to retrieve a plasma television, and a local judge was permitted to retrieve a gavel—which she later returned after realizing it was not hers.

The search warrant authorized the police to seize items including drugs, drug paraphernalia, weapons, and "illegally obtained proceeds derived from violations of federal or state statutes concerning felony possession, distribution and/or manufacturing of controlled substances." Officers seized approximately 82 grams of methamphetamine, including 74 grams found in a safe at the foot of the bed in "Lou room/Ray's room." Officers also seized guns, drug paraphernalia, three ledgers, and several thousand pieces of stolen property. The ledgers, one of which Officer Frank Santos testified at trial "represented a typical drug ledger," identify dollar amounts in the hundreds and thousands, along with dates, notes such as "credit," and descriptions of items such as "bracelet" or "beer." In "Lou Room/Ray's Room," the officers found not only the ledger and the drug-filled safe, but also guns and more drugs. GPD officers photographed that evidence *in situ* and then removed it from the property. Officers moved the other seized property to the staging area in the front yard. The search lasted two days because of the several thousands of items the officers needed to catalog.

Meanwhile, Ray and Lou were arrested shortly after the search commenced and were taken to the Tamuning precinct. Thereafter, Ray and Lou each gave written and oral statements regarding the drugs and the stolen property. In his statement, Ray wrote that he had purchased numerous items, including firearms, plasma televisions, power tools, and jewelry, with either cash or methamphetamine. Ray added that he "received the drug 'ice' through a friend who needed help to find buyers." Officer Smith took Ray's statement, and later testified at a suppression hearing that Ray told him that he had been selling methamphetamine in exchange for stolen goods.[2]

Ray, Officer Smith, and Special Agent Michelle Jong of the DEA gave contradictory testimony about how Ray came to give his statements to Officer Smith. After he was initially apprehended by the SWAT team, Ray complained of injury. He was eventually taken to the hospital by Officer Smith. Smith and Ray had once been friends and had worked together as cable installers, but had parted ways in 1997 when Smith entered the police academy. According to Smith, Ray called him over at the hospital and said, "Frank, the stuff at the house . . . ." Smith testified that he interrupted Ray, telling him "Ray, this is not the time, let's get you treated first, talk about this at the precinct." Ray was examined at the hospital and returned to the Tamuning precinct that afternoon.

Once Ray returned to the precinct, Special Agents Jong and Than Churchin attempted to interview him, after advising him of his *Miranda* rights. Jong stated that Ray said that he wanted to talk with an attorney before making a statement. Jong testified that she then ended the interview and told Ray

---

[2]Because neither Ray nor Lou testified at trial, the prosecution used redacted versions of these statements to avoid a Confrontation Clause violation. *See Bruton v. United States*, 391 U.S. 123 (1968). The district court instructed the jury that it could not consider Lou's statement against Ray, or Ray's statement against Lou, when weighing each of the defendants' guilt or innocence.

she would look into getting him a Federal Public Defender. She also told Ray that if he wanted to speak with her, he would need to reinitiate contact. As she left the room, she encountered Officer Smith. Jong informed Smith that Ray had invoked his right to counsel. Smith then went into the conference room. When Jong saw Smith and Ray talking, she entered to ask whether Ray wanted her present. When he shook his head "no," she left, and had no more contact with Ray.

At the suppression hearing, Smith offered a different story[3] : he testified that Jong did not tell him that Ray had asked for an attorney, but instead "informed me that he didn't want to talk to her, but wanted to talk to one of us." "I told her," Smith added, "I said I know why . . . I know him, and I told her that I would go and talk to him." Smith went into the conference room and said: "How are you doing, Ray?" Ray responded that he did not want to talk to the federal agents, because they scared him, but that he would talk to Smith. Smith then re-advised Ray of his *Miranda* rights. Ray signed a form waiving those rights and indicating that he was willing to make a statement. Ray then gave oral and written statements admitting to selling methamphetamine out of his home in exchange for stolen items; he also named his source.[4]

---

[3]Defense counsel cross-examined Smith during the suppression hearing. The circumstances and nature of Ray's cross-examination are critical to determining whether the district court erred by admitting Officer Smith's suppression-hearing testimony at trial under Federal Rule of Evidence 804(b)(1), and are described in detail in Section VI, *infra*.

[4]Ray did not testify at the suppression hearing, but offered a declaration, in which he stated that after he returned to the precinct he was yelled at by Officers Smith and Piolo, who threatened him and told him that unless he cooperated he would never see his mother, wife, or children again. Ray claimed that Smith came into the conference room, showed him Lou's written confession and, without advising him of his rights, told him to "sign a waiver and write down everything they wanted to know and everything will stop . . . ." Smith denied that he threatened Ray, and said he would not threaten a friend. In denying the suppression motion, the district court did not address Ray's declaration.

Lou's statement acknowledged that police had found many items, including "bush cutters, generator, cars, laptops," and that both she and Ray were "aware of what's going on, that the item are stolen, we exchange dope & cash to merchandise." GPD Officer Albert Piolo testified at trial that he and Officer Smith took Lou's oral statement, and that she admitted to trafficking in methamphetamine for about a year and selling methamphetamine in exchange for, among other things, jewelry and a washing machine. Lou told the officers that she distributed about one gram of methamphetamine at a time. Special Agent Jong, who interviewed Lou separately, testified at trial that Lou said that she occasionally used methamphetamine, and kept about a gram at the house.

## II.   Procedural Background

A Superseding Indictment charged Ray with: (1) conspiracy to distribute more than 50 grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846; (2) possessing more than 50 grams of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1); (3) using and carrying a firearm during a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i); (4) being a felon in possession of firearms in violation of 18 U.S.C. § 922(g)(1); and (5) possessing stolen guns in violation of 18 U.S.C. § 922(j). Lou was charged with: (1) conspiracy to distribute more than 50 grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846; and (2) possessing more than 50 grams of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1).

Following a lengthy suppression hearing, the district court denied the Duenases' joint motion to suppress the physical evidence seized from their property. The district court reasoned that while the presence of members of the media on the property during the search violated the Duenases' Fourth Amendment rights, the physical evidence was not subject to the exclusionary rule because there was no evidence that any

member of the media was permitted to roam the property freely "or in any way assisted in the search or touched any of the property."

Ray also moved to suppress his statements, arguing that they were obtained in violation of *Miranda* because he had been questioned before his rights were read to him, and that, in any event, his statements were involuntary because his will "had been . . . overborne" by the police on the day of the search, as he had been injured, tired, frightened, and emotional when questioned. The district court denied Ray's motion, finding that despite his initial refusal to talk, Ray subsequently waived his right to counsel before speaking with Officer Smith, and gave his statements voluntarily.

After the suppression hearing and before trial, Officer Smith was killed by a drunk driver. Over Ray's hearsay objection, the district court concluded that Smith's testimony was "former testimony" under Federal Rule of Evidence 804(b)(1), and allowed Special Agent Sedberry to read portions of Smith's suppression hearing testimony to the jury.

At the end of the case-in-chief, Ray and Lou moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Lou argued that there was no evidence of conspiracy, and that there was no proof that she had "possessed" any drugs. Ray argued, *inter alia*, that there was no evidence that he resided at the house. The district court denied both motions.

On March 17, 2009, a jury convicted Ray of conspiracy and possession with intent to distribute, use of a firearm during a drug crime, and possession of stolen firearms. The jury convicted Lou of both conspiracy and possession with intent to distribute.

Ray and Lou timely renewed their Rule 29 motions. On December 2, 2009, the district court denied their motions, and

sentenced Ray to 25 and Lou to 20 years of imprisonment, the statutory mandatory minimums for both.

## III.   Jurisdiction and Standards of Review

We have jurisdiction under 28 U.S.C. § 1291. We review de novo the denial of a motion to suppress, *United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc), and review for clear error factual findings underlying the denial of such a motion, *United States v. Bynum*, 362 F.3d 574, 578 (9th Cir. 2004). We also review de novo whether the exclusionary rule applies to a given case. *Crawford*, 372 F.3d at 1053 (citing *United States v. Hammett*, 236 F.3d 1054, 1057-58 (9th Cir. 2001)). " 'The District Court's construction or interpretation of . . . the Federal Rules of Evidence, including whether particular evidence falls within the scope of a given rule, is subject to de novo review.' " *United States v. Garrido*, 596 F.3d 613, 616 (9th Cir. 2010) (quoting *United States v. Durham*, 464 F.3d 976, 981 (9th Cir. 2006)). "Once it has been determined that challenged evidence falls within the scope of a given rule, the District Court's decision to admit the evidence is reviewed for abuse of discretion." *Id.* (internal quotation marks omitted). Where, as here, a defendant preserves her claim of insufficient evidence by making a motion under Federal Rule of Criminal Procedure 29 at the close of the evidence, we review de novo the sufficiency of the evidence supporting the conviction. *United States v. Tucker*, 641 F.3d 1110, 1118 (9th Cir. 2011) (citing *United States v. Ruiz*, 462 F.3d 1082, 1087-88 (9th Cir. 2006)).

## IV.   Suppression of the Physical Evidence

The district court did not err by denying the Duenases' motions to suppress the physical evidence seized from their property. The district court found that the media were present on the front yard of the Duenas compound, but that their presence did not violate the Fourth Amendment because the front yard was not curtilage, and there was no basis to find a rea-

sonable expectation of privacy in the front yard. The district court also found, however, that the GPD violated the Fourth Amendment by escorting certain members of the media beyond the front yard. Nonetheless, the district court declined to exclude the physical evidence resulting from the execution of the warrant because the police conducted the search within the parameters of the warrant, and there was no suggestion that any member of the media discovered or developed any evidence seized from the property.

## A.   Fourth Amendment Violation

**[1]** The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Duenases contend that the presence of the media rendered the search of their compound unreasonable. Whether the police violated the Duenases' Fourth Amendment rights is difficult to determine based on the factual record developed below, as it is unclear whether any members of the media entered the Duenases' home or its curtilage.

**[2]** The leading case that addresses the presence of the media during the execution of a search warrant is *Wilson v. Layne*, 526 U.S. 603 (1999). In *Wilson*, U.S. Marshals and county police permitted a reporter and a photographer from the *Washington Post* to "ride-along" as they entered a home pursuant to an arrest warrant. *Id.* at 607. The photographer took "numerous pictures" in the home during the execution of the warrant. *Id.* The homeowners sued the Marshals under *Bivens*[5] and the county police under 42 U.S.C. § 1983. *Id.* at 608. The Court first noted "the 'overriding respect for the sanctity of the home that has been embedded in our traditions

---

[5]*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 395 (1971) (holding that "damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials").

since the origins of the Republic,' " *id*. at 610 (quoting *Payton v. New York*, 445 U.S. 573, 601 (1980)), adding that "the Fourth Amendment does require that police actions in execution of a warrant be related to the objectives of the authorized intrusion," *id.* at 611 (citing *Arizona v. Hicks*, 480 U.S. 321, 325 (1987)). In *Wilson*, the warrant made no mention of media presence or assistance, *id.* at 606, and "the presence of reporters inside the home was not related to the objectives of the authorized intrusion," *id*. at 611. The Supreme Court thus held that "it is a violation of the Fourth Amendment for police to bring members of the media or other third parties into a home during the execution of a warrant when the presence of the third parties in the home was not in aid of the execution of the warrant." *Id*. at 614.

The government challenges the Duenases' standing to raise a Fourth Amendment claim, arguing that the media never entered any area in which Ray and Lou had a "legitimate expectation of privacy." *See Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). In *Katz v. United States*, 389 U.S. 347 (1967), the Supreme Court, reasoning that "the Fourth Amendment protects people, not places," concluded that the government violated Katz's Fourth Amendment rights by attaching an eavesdropping device to a public phone booth in which he was engaged in conversation. *Id.* at 351. Justice Harlan, concurring, construed the majority opinion as holding that a Fourth Amendment violation occurs where the government intrudes upon an individual's "reasonable expectation of privacy." *Id.* at 360-61. Some of our past opinions have mistakenly imported Justice Harlan's "reasonable expectation of privacy" test into areas expressly protected by the Fourth Amendment—the home and the area traditionally treated as the home, the curtilage to the home. *See, e.g.*, *United States v. Pineda-Moreno*, 591 F.3d 1212, 1215 (9th Cir. 2010), *vacated*, 132 S. Ct. 1533 (2012); *United States v. Magana*, 512 F.2d 1169, 1170-71 (9th Cir. 1975).

[3] In fact, as the Supreme Court recently clarified in *United States v. Jones*, 132 S. Ct. 945 (2012), the *Katz* "ex-

pectation of privacy" test extends the traditional reach of the Fourth Amendment to areas outside one's home, such as phone booths, hotel rooms, homes at which one is an overnight guest, and workplace offices. *See, e.g.*, *Katz*, 389 U.S. at 351 (phone booths); *Minnesota v. Olson*, 495 U.S. 91, 98-99 (1990) (hotel rooms and overnight guests); *O'Connor v. Ortega*, 480 U.S. 709, 718 (1987) (offices). In *Jones*, the Court reaffirmed that the home and its curtilage are sacrosanct, and that nothing in *Katz* requires courts to apply the reasonable expectation of privacy standard in addition to finding that the subject of the search was "persons, houses, papers, [or] effects." 132 S. Ct. at 951. Reasoning that "*Katz* did not narrow the Fourth Amendment's scope," *id.*, but instead extended the Fourth Amendment's protection to nontraditional areas, *id.* at 952, the Court noted that the *Katz* test was "*added to*, not *substituted for*, the common-law trespassory test." *Id.* (emphasis in original). Whether Ray and Lou have standing thus turns on the same determination as the Fourth Amendment claim itself: whether the media entered the Duenases' home or its curtilage, or any place in which they had a reasonable expectation of privacy.

**[4]** The curtilage of one's home warrants the same Fourth Amendment protection as the home itself. *Oliver v. United States*, 466 U.S. 170, 180 (1984). "[T]he extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *United States v. Dunn*, 480 U.S. 294, 300 (1987) (citing *Oliver*, 466 U.S. at 180). We consider four factors in determining whether an area is curtilage: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id.* at 301. While combining these factors does not produce "a finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions," the factors are useful in deter-

mining "the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

**[5]** The district court found that most of the journalists were confined to the front yard, which it determined was not curtilage. It correctly concluded that only the first of the four *Dunn* factors suggested that the front yard was curtilage. The front yard was not enclosed; there was no evidence as to how the yard was used; nor was there any evidence that the Duenases tried to protect the yard from observation. We therefore agree with the district court that the front yard was not curtilage, and the presence of the media there did not violate the Fourth Amendment.

However, some journalists were escorted beyond the front yard. Officer Scott Wade escorted journalists to the rear of the residence to photograph a marijuana patch. The media described the marijuana patch as "at the end of a nearly 150-foot jungle trail, amid a forest of ferns and shrubbery." Chief of Police Suba took some journalists on a tour of the compound to film the seized stolen property, hoping victims might come forward to claim their property, but it is unclear from the record whether Suba led the journalists inside any of the structures on the property or onto the curtilage.

**[6]** The district court declined to make an explicit factual determination as to whether the media entered the curtilage, but, in finding a Fourth Amendment violation, it focused on the fact that the police escorted journalists to the jungled area at the back of the property to photograph a marijuana patch. The parties do not point to evidence in the record regarding whether that area meets any of the *Dunn* criteria. While the *Dunn* factors are not strictly applicable to the Duenases' private jungle compound, there is some evidence suggesting that the backyard was curtilage: it was adjacent to the four structures, was in a heavily jungled area, and was not visible from

either the main road or the dirt road. *See, e.g.*, *United States v. Romero-Bustamente*, 337 F.3d 1104, 1108 (9th Cir. 2003) (holding that backyard falls within the curtilage); *United States v. Struckman*, 603 F.3d 731, 739 (9th Cir. 2010) (same). However, there is scant evidence as to the uses to which the backyard was put, the proximity of the marijuana patch to the Duenases' shack, and whether it was within an enclosure surrounding the home. On this record, it is not clear whether the media entered the Duenases' curtilage when it walked through the rear of the property to view the marijuana patch.[6]

[7] Although the district court decided that the media's presence beyond the front yard was a Fourth Amendment violation, the record does not necessarily support this finding. However, this lack of clarity is at least partially attributable to the GPD's "woefully inadequate" management of the search scene. Given the district court's ruling that the evidence was nevertheless non-excludable, and the government's responsibility for this murky record, we assume, without deciding, that a Fourth Amendment violation occurred, and turn our attention to whether the district court properly held that the evidence should not be excluded.

---

[6]As the district court noted, the police also may have violated the Duenases' constitutional rights by removing the seized evidence from the house and structures and placing it in the staging area in the front yard for the media to photograph. The district court did not expressly rule on this issue, although it did note that it was "concerned" by the behavior of the police. While we have not previously considered whether *Wilson* extends to this activity, we need not reach the question here, because contraband does not lie within the express protection of the Fourth Amendment and the Duenases had no legitimate expectation of privacy in property that did not belong to them. *See Rakas*, 439 U.S. at 143 n.12. We are concerned, as was the district court, that the GPD removed all property from the compound, and that some of that property was likely the Duenases' "papers and effects," given the GPD's haphazard management of the search.

## B. Exclusionary Rule

**[8]** Assuming that a Fourth Amendment violation occurred, we, like the district court, reject the Duenases' contention that suppression is the appropriate remedy. Because *Wilson* was a *Bivens* action, the Supreme Court was not required to address the application of the exclusionary rule. 526 U.S. at 608. The Court expressly declined to decide "whether the exclusionary rule would apply to any evidence discovered or developed by the media representatives." *Id.* at 614 n.2. We, similarly, have not previously decided whether the exclusionary rule applies to evidence obtained by police who have violated the Fourth Amendment by allowing the media to intrude into the location of the search.

**[9]** A Fourth Amendment violation does not automatically trigger the exclusionary rule. Rather, the rule applies only where the benefit of deterrence outweighs the rule's " 'substantial social costs.' " *Davis v. United States*, 131 S. Ct. 2419, 2427 (2011) (quoting *United States v. Leon*, 468 U.S. 897, 907 (1984)). Application of the exclusionary rule is a fact-intensive inquiry. *See United States v. $186,416.00 in U.S. Currency*, 590 F.3d 942, 950 (9th Cir. 2010) (citation omitted). "To apply the exclusionary rule to [a] unique set of facts . . . we must consider the rule's dual purposes: to deter similar police misconduct in the future and to preserve the integrity of the courts." *Id.* (citing *Dunaway v. New York*, 442 U.S. 200, 217-18 (1979)).

**[10]** The Eleventh Circuit has weighed the benefits and costs of applying the exclusionary rule in an analogous context. *See United States v. Hendrixson*, 234 F.3d 494, 496-97 (11th Cir. 2000). In *Hendrixson*, police were accompanied by a television reporter while searching a defendant's residence for methamphetamine. *Id.* at 496. The reporter "arrived after the search was in progress and did not move, touch or handle anything in the residence." *Id.* Although the Eleventh Circuit found that the media's presence violated the Fourth Amend-

ment, it declined to suppress the evidence found during the search. *Id.* The court emphasized that the purpose of the warrant clause of the Fourth Amendment is to prevent the police from conducting "general searches" that go beyond the scope of the warrant. *Id.* at 497 (citing *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)). In *Hendrixson*, the police did not exceed the parameters of the warrant, because the "media presence did not expand the scope of the search," the search was "actually carried out by the police themselves," and there was "no allegation that the reporter aided the search; he did not touch, move, or handle anything in the residence." *Id.* at 497. The court suggested that the deterrence goals of the exclusionary rule in such circumstances could be better served through 42 U.S.C. § 1983 or *Bivens* actions. *Id.* at 497 n.4.

**[11]** We agree with the Eleventh Circuit that where the media were present, but did not discover or develop any of the evidence later used at trial, the evidence need not be excluded. Here, the media did not expand the scope of the search beyond the warrant's dictates; nor did the media assist the police, or touch, move, handle or taint the admitted evidence in any way. Because the GPD complied with the terms of the warrant and the media did not disturb any evidence later admitted,[7] the more appropriate remedy here, as the Eleventh Circuit concluded in *Hendrixson*, is a *Bivens* or a 42 U.S.C. § 1983 action.

## V.   Sufficiency of the Evidence Supporting Lou's Conviction

**[12]** Lou contends that the evidence at trial was insuffi-

---

[7]We note that the stolen property seized by the GPD and staged in the front lawn was not introduced at trial by the government. The government's exhibit list was limited to the guns, drugs, drug paraphernalia, drug records, valuables, and related photographs and diagrams seized from the shack. In a sense, then, the prosecution self-executed the exclusionary rule with respect to the most questionable evidence.

cient to show that she conspired to distribute (Count One) or possessed with intent to distribute (Count Two) more than 50 grams of methamphetamine. Evidence is sufficient to sustain a conviction if, when it is construed in the light most favorable to the prosecution, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Nevils*, 598 F.3d 1158, 1161 (9th Cir. 2010) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original). We conclude that the district court correctly denied Lou's Rule 29 motion.

## A. The Possession Count

To establish that Lou was guilty on Count One, the government was required to prove that Lou: (1) knowingly possessed over 50 grams of methamphetamine; and (2) intended to deliver it to another person. *See United States v. Diaz-Cardenas*, 351 F.3d 404, 407 (9th Cir. 2003). Lou concedes that the evidence, including her written statement, was sufficient to show that she possessed and intended to distribute *some* methamphetamine, but she argues that the evidence was insufficient to support a finding as to quantity. We disagree. Viewed in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Lou constructively possessed and intended to distribute at least the 74 grams of methamphetamine found in the safe in her bedroom.

Possession of a controlled substance may be either actual or constructive. *See United States v. Disla*, 805 F.2d 1340, 1350 (9th Cir. 1986). An individual constructively possesses drugs when he or she exercises "dominion and control" over them. *Id.* Constructive possession may be established by direct or circumstantial evidence that the defendant had the power to dispose of the drug, the ability to produce the drug, or that the defendant had the " 'exclusive control or dominion over property on which contraband narcotics are found.' " *Id.* (quoting *Arellanes v. United States*, 302 F.2d 603, 606 (9th

Cir. 1962)). It may also be demonstrated "by a defendant's participation in a joint venture, by which he shares authority with others to exercise dominion and control over the drug." *United States v. Ramos-Rascon*, 8 F.3d 704, 711 (9th Cir. 1993).

**[13]** "Mere proximity to contraband, presence on property where it is found, and association with a person or persons having control of it are all insufficient to establish constructive possession." *United States v. Rodriguez*, 761 F.2d 1339, 1341 (9th Cir. 1985). For instance, the mere fact that a defendant is a joint occupant of a residence at which contraband is found is insufficient to establish constructive possession by any particular occupant. *See, e.g.*, *Delgado v. United States*, 327 F.2d 641, 642 (9th Cir. 1964) (marijuana found in nightstand in defendant couple's shared bedroom did not, standing alone, establish that either individual had possession). In cases of shared occupancy, the government must introduce "some evidence tying the defendant to the particular contraband." *United States v. Barajas-Montiel*, 185 F.3d 947, 955 (9th Cir. 1999).

**[14]** Here, ample evidence tied Lou to the 74 grams of methamphetamine in the safe in her bedroom. Lou admitted to Officer Piolo and Special Agent Jong that she used methamphetamine and trafficked in it in exchange for stolen goods. She was at the residence during the search, and the room officers designated as "Lou room/Ray's room," where the safe was found at the foot of the bed, was actually Lou's and Ray's bedroom, in which both were found sleeping on the morning of the search. Many of Lou's personal effects were found in that room, including wedding pictures of Ray and Lou and their W-2 forms. From this evidence, the jury could reasonably infer that Lou exercised dominion and control over the bedroom and its contents.

Lou's argument that she did not have access to the safe and was unaware of its contents is belied by the evidence. Officer

Santos and Special Agent Jong testified that the safe was unlocked.[8] In addition to the 74 grams in the safe, smaller pouches of methamphetamine and drug paraphernalia were scattered about the bedroom. Police found three drug ledgers in the room, reflecting trafficking involving thousands of dollars. Because Lou admitted that she trafficked in methamphetamine, and her shared bedroom was littered with obvious evidence of a drug dealing operation, a rational trier of fact could conclude that Lou was aware of and exercised dominion and control over the drugs in the room. *See United States v. Hernandez*, 876 F.2d 774, 778 (9th Cir. 1989) (fact that defendant resided at co-defendant's apartment during the week and kept clothes there "raises an inference of constructive possession" of drugs kept in apartment); *United States v. Castillo*, 866 F.2d 1071, 1088 (9th Cir. 1988) ("[E]vidence that cocaine was found in plain view, coupled with the evidence of [defendant's] physical control of the bedroom, was sufficient to demonstrate knowledge and his dominion and control of all the narcotics found in the bedroom.").

The conclusion that Lou possessed and intended to distribute over 50 grams of methamphetamine is bolstered by Lou's admission to Officer Piolo that she trafficked in methamphetamine because it was the only way she could make a living. That Lou depended on methamphetamine deals as her sole source of income is strong evidence that she trafficked in quantities over 50 grams.

---

[8]Lou argues that evidence was presented at trial suggesting that the safe was locked, and thus unavailable to her. However, the only evidence to that effect was Lou's own statement, made to Special Agent Sedberry, that she did not have access to or knowledge of the contents of the safe. "[W]hen 'faced with a record of historical facts that supports conflicting inferences' a reviewing court 'must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' " *Nevils*, 598 F.3d at 1164 (quoting *Jackson*, 443 U.S. at 326). Viewed in the light most favorable to the prosecution, the evidence supports an inference that the safe was closed but unlocked.

**[15]** Therefore, the district court did not err in concluding that a rational trier of fact could find that Lou had dominion and control over the bedroom and thus "possessed" its contents, including the 74 grams of methamphetamine in the safe.

## B.   The Conspiracy Count

**[16]** "To establish a drug conspiracy, the government must prove (1) an agreement to accomplish an illegal objective; and (2) the intent to commit the underlying offense." *United States v. Reed*, 575 F.3d 900, 923 (9th Cir. 2009) (quoting *United States v. Iriarte–Ortega*, 113 F.3d 1022, 1024 (9th Cir. 1997), *amended by* 127 F.3d 1200 (9th Cir. 1997)). Lou argues that there was insufficient evidence of her agreement to possess or distribute methamphetamine. She asserts that the government never proved that she possessed more than one gram of methamphetamine at a time, and thus never proved that she agreed to sell more than 50 grams.

**[17]** Agreement to commit a crime exists where all the parties work together "with a single design for the accomplishment of a common purpose." *Marino v. United States*, 91 F.2d 691, 694 (9th Cir. 1937) (quoting *Fowler v. United States*, 273 F. 15, 19 (9th Cir. 1921)). The government need not prove an express or formal agreement; instead, "agreement may be inferred from conduct." *United States v. Mincoff*, 574 F.3d 1186, 1192 (9th Cir. 2009) (quoting *United States v. Hegwood*, 977 F.2d 492, 497 (9th Cir. 1992) (citation omitted)). Agreement may also be proved by circumstantial evidence. *See United States v. Chong*, 419 F.3d 1076, 1079 (9th Cir. 2005) (citing *United States v. Pemberton*, 853 F.2d 730, 733 (9th Cir. 1988)).

**[18]** Here, the evidence was such that a rational juror could find that Lou worked with at least one other individual "with a single design for the accomplishment of a common purpose." *Marino*, 91 F.2d at 694. Lou's written statement provides the most direct evidence of an agreement. After naming

her supplier, Lou wrote, "My husband and I we both aware of what's going on, that the item are stolen, we exchange dope (ice) & cash to merchandise." Lou's admission that "*we*" exchange methamphetamine for merchandise more than supports a finding that Lou and Ray were working in concert to distribute the drugs.

At trial, Officer Piolo testified that Lou admitted to distributing methamphetamine in exchange for stolen goods, and that she told him that she did so because it was her only way of making a living. Piolo and Special Agent Jong testified that Lou gave them the name of her supplier and the name of an individual who brought stolen items to the property. Piolo testified that Lou told him that her mother-in-law "may have been suspicious of *their* activity, but [was] not involved in it, *they* just tried and hide it from her." (emphasis added). Lou's use of the words "their" and "they" is evidence that she was acting in concert with, and thus agreed with, at least one other individual.

Moreover, 74 grams of methamphetamine were found in an unlocked safe at the foot of the bed that Lou shared with Ray. A rational juror could conclude that neither Ray nor Lou would have left such a large quantity of drugs in an unlocked safe in a room they both used were they not working together to distribute the drugs.

**[19]** Therefore, the district court did not err in concluding that a rational trier of fact could find beyond a reasonable doubt that Lou and Ray agreed to distribute over 50 grams of methamphetamine.

## VI. Officer Smith's Former Testimony

However, we are compelled to conclude that the district court should not have admitted Officer Smith's suppression hearing testimony following his unfortunate demise. The district court admitted the testimony as "former testimony" under

Federal Rule of Evidence 804(b)(1), reasoning that Ray "had a meaningful opportunity to cross-examine Officer Smith" about the "context and details" of Officer Smith's testimony at the suppression hearing, but made "a tactical decision" not to do so. We disagree, because the district court failed to compare Ray's "fundamental objectives" at each hearing to find a similar motive under Rule 804(b)(1).[9]

**[20]** "Former testimony" is not hearsay if a declarant is unavailable. "Former testimony" is testimony that:

> (A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and

> (B) is now offered against a party who had—or, in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

Fed. R. Evid. 804(b)(1). Smith was "unavailable" because he was deceased, and his former testimony was given during the pre-trial suppression hearing. *See* Fed. R. Evid. 804(a)(4). Thus, the critical question is whether Ray had the "opportunity and similar motive" to develop Officer Smith's testimony by direct, cross-, or redirect examination at the suppression hearing as he would have had at trial. *See United States v. Salerno*, 505 U.S. 317, 321 (1992) (holding that former testimony may not be introduced under Rule 804(b)(1) without a showing of "similar motive").[10] Because Ray's motive at the

---

[9]Ray moved to suppress the written and oral statements he gave to Officer Smith on the alternative ground that they were obtained in violation of the Fifth Amendment. We do not reach this argument given our conclusion that the statements were inadmissible under Rule 804(b)(1).

[10]Ray does not argue that the admission of Smith's testimony violated his Sixth Amendment right to confrontation. Where the requirements of Rule 804(b)(1) are met, we generally conclude that the Confrontation

suppression hearing was solely to demonstrate that his statements were involuntary and obtained in violation of *Miranda*, and thus inadmissible, his motive for cross-examining Officer Smith at trial, to challenge the substance of the statements as opposed to the circumstances in which they were given, was substantially dissimilar.

In *Salerno*, the only Supreme Court decision to address the "similar motive" requirement, the Court clarified that "similar motive" is a necessary element of Rule 804(b)(1). *Id.* at 321. However, it did not explain how courts should determine whether a party's motives are "similar." *Id.* at 325. Justice Blackmun, concurring, provided some guidance by noting that "similar motive" does not mean "identical motive," and that the "similar motive" analysis is "inherently a *factual* inquiry" based on "the similarity of the underlying issues and on the context of the . . . questioning." *Id*. at 326 (emphasis in original).

We have twice addressed whether, under Rule 804(b)(1), suppression hearing testimony is admissible at a later proceeding. *See United States v. Geiger*, 263 F.3d 1034 (9th Cir. 2001); *United States v. Poland*, 659 F.2d 884 (9th Cir. 1981) (per curiam). The government argues that these cases dictate the outcome of our "similar motive" analysis. We find *Poland* and *Geiger* to be factually inapposite, however, and conclude that neither decision controls our "inherently . . . factual inquiry." *Salerno*, 505 U.S. at 326 (emphasis omitted).

In *Poland*, an eye-witness identified the defendant in a lineup. 659 F.2d at 896. A suppression hearing, at which the

Clause is not violated. *See United States v. Yida*, 498 F.3d 945, 950 (9th Cir. 2007) ("Rule 804(b)(1) implements the command of the Sixth Amendment's Confrontation Clause."); *see also United States v. Salim*, 855 F.2d 944, 955 (2d Cir. 1988) ("[S]tatements that are admitted pursuant to [the Rule 804(b)(1)] exception commonly have been found to satisfy the confrontation clause").

defense cross-examined the witness, was held to determine whether the line-up was impermissibly suggestive. *Id.* at 895-96. Denying the motion to suppress, the district court concluded that the lineup was "fair and not unjust." *Id.* at 895. The witness died before trial, and the district court granted the prosecution's motion to admit a transcript of the suppression hearing testimony at trial. *Id.* at 895-896. On appeal, the defendant argued that he would have been motivated at trial to test the witness's reliability by cross-examining him about his eyesight, whether he was intoxicated, and the distance from which he observed the defendant, inquiries that he was not motivated to make at the suppression hearing. *Id.* at 896. We rejected this argument and concluded that the "similar motive" requirement was satisfied, noting that pretrial identifications are admissible if they are reliable, even if the identification procedure is unduly suggestive. *Id.* Thus the defendant's motive in cross-examining the witness at both the suppression hearing and trial was the same: to cast doubt on the witness's reliability with questions about his eyesight, intoxication, and the like. *Id.*

In *Geiger*, the question was not whether suppression hearing testimony was admissible at trial, but rather whether an officer's testimony at a state suppression hearing was admissible at a subsequent federal suppression hearing. 263 F.3d at 1038. The defendant in *Geiger* admitted in a taped confession taken by Officer Churchill that he had placed a bomb in the victim's truck. *Id.* at 1036. Before Geiger was indicted in federal court, the state of Alaska charged him with first degree murder. *Id.* at 1038. Geiger successfully sought suppression of the recorded confession in state court, because the arresting officers, including Officer Churchill, had failed to comply with Alaska's custodial interrogation requirements. *Id.* Officer Churchill, who testified at the state suppression hearing, died before the federal suppression hearing. The magistrate judge admitted his testimony at the federal hearing under Rule 804(b)(1). *Id.* Geiger contended that the court erred in admitting the former testimony, because the state hearing focused

on Alaska's custodial interrogation requirements, while the federal suppression hearing concerned the sufficiency of his *Miranda* warning, the voluntariness of his statement, and his request for counsel. *Id.* We rejected Geiger's argument, reasoning that the similarity of his state and federal motions to suppress belied his claim of dissimilar motives: "Both motions to suppress presented virtually the same issues: whether Geiger's taped confession was coerced and involuntary; whether Geiger had been properly *Mirandized*; whether the arrest was pretextual; and whether Geiger had been unlawfully detained." *Id.* Geiger also introduced the exact same detailed affidavit in both hearings. *Id*. at 1038-39. Moreover, Churchill's testimony at the state hearing addressed issues pertinent to the federal hearing, such as his role in the interrogation, whether Geiger asked for an attorney or refused to speak, whether he coerced Geiger into confessing, and whether he threatened Geiger's family. *Id*. at 1039. Because the legal and factual issues in both hearings were "substantially similar," we concluded that Geiger had a "similar motive" at both hearings. *Id.*

We have also addressed the "similar motive" prong in other contexts. In *United States v. McFall*, 558 F.3d 951 (9th Cir. 2009), we examined whether exculpatory grand jury testimony is admissible at trial against the prosecution, an issue on which the courts of appeals are split. *Id.* at 962. The First and Second Circuits examine whether the government "t[ook] the same side on the same issue" and whether it had the same degree of interest to prevail at each proceeding. *Id*. (citing *United States v. DiNapoli*, 8 F.3d 909 (2d Cir. 1993) (en banc); *United States v. Omar*, 104 F.3d 519, 522-24 (1st Cir. 1997)). In *McFall*, we rejected this "fine-grained" method and followed the D.C. and Sixth Circuits in comparing motives at a "high level of generality." *Id*. (citing *United States v. Miller*, 904 F.2d 65, 68 (D.C. Cir. 1990)). We noted that the government need not have the same "intensity" of motivation at each proceeding, because the plain language of Rule 804(b)(1) requires similar, but not identical, motivation. *Id*. at 963.

McFall was charged with conspiracy to commit extortion. *Id*. at 955. McFall's co-conspirator, Sawyer, at that point uncharged, appeared before a grand jury and offered a first-person account of key events that contradicted the testimony of the government's primary witness and corroborated McFall's version of the events. *Id*. at 961. Sawyer died before trial, and McFall sought to introduce a transcript of the exculpatory grand jury testimony under Rule 804(b)(1). *Id*. The district court did not admit the transcript, concluding that the government's motive at trial was "completely different" than its motive before the grand jury because Sawyer was not a suspect at the time of his testimony and because the grand jury was a fact-finding investigation, not an adversarial proceeding. *Id*. at 962. We held that the district court "erred in concluding that the government's respective motives were 'completely different,' and the exclusion of Sawyer's grand jury testimony as hear-say amounted to an abuse of discretion." *Id*. at 963. Although we noted that the government's incentive to develop incriminating testimony before the grand jury was "likely not as intense as it would have been at trial," we nevertheless held that the government's "fundamental objective" was the same at each proceeding. *Id*. That "fundamental objective" was "to draw out testimony that would support its theory that McFall conspired with Sawyer to commit extortion—the same motive it possessed at trial." *Id*.

Finally, we recently had occasion to address the issue of "similar motive" in the context of an SEC investigation of a CFO involved in a stock option back-dating scandal. *See Sec. & Exch. Comm'n v. Jasper*, 678 F.3d 1116 (9th Cir. 2012). The SEC alleged that Jasper engaged in an illegal scheme to back-date stock options granted to employees and directors. *Id*. at 1119. The company's former treasurer, Ruehle, made exculpatory statements in sworn testimony taken in connection with the SEC's fact-gathering investigation. *Id*. at 1128. Because Ruehle was unavailable at the time of trial, Jasper attempted to introduce his testimony under Rule 804(b)(1). *Id*. The district court found the testimony inadmissible, conclud-

ing that the SEC had a different motive at the accusatory stage of the proceedings than it did during the investigatory stage. *Id*. We affirmed, because the district court did not abuse its discretion based on the inherently different motives involved in an early investigation, at which "open-ended questions are typically asked without expectation the witness will be needed at trial," and a cross-examination of an adverse witness. *Id*. at 1128-29.

As the foregoing cases demonstrate, we have not developed a bright-line test for determining similarity of motive. Nor should we. As Justice Blackmun instructed, the "similar motive" analysis is "inherently a factual inquiry" based on "the similarity of the underlying issues and on the context of the . . . questioning." *Salerno*, 505 U.S. at 326 (emphasis omitted). Here we are faced with a unique set of facts that does not fit squarely within the ambit of any of our aforementioned precedent.

The transcript of Ray's suppression hearing demonstrates that his counsel did not have a similar motive in questioning Officer Smith at the suppression hearing as at trial. Ray's "fundamental objective," *McFall*, 558 F.3d at 963, in questioning Officer Smith at the suppression hearing was to elicit testimony to prove that his statements to Smith were involuntary and obtained in violation of *Miranda*. This was Ray's sole purpose in examining Smith, a point Ray's counsel made emphatically when the prosecution veered into the substance of the statement and sought details about Ray's meetings with his drug source. Ray's counsel objected to this inquiry as "having no relevance or bearing on" the only question at issue —whether Ray voluntarily spoke with Smith. After the district court overruled Ray's objection, Ray's counsel offered to enter the written statement into evidence for purposes of the suppression hearing, rather than to permit the prosecutor to go into detail about the substance of the statement. The prosecutor acquiesced to the defense's limitation on its inquiry and

simply asked Officer Smith to identify Ray's statement before introducing it into evidence.

During the cross-examination of Officer Smith at the suppression hearing, Ray's counsel inquired only about the circumstances under which Ray was arrested and made the statement. Counsel asked about the duration of Smith's interview with Ray, whether Ray was under the influence of any drugs or medication at the time of the statement, whether he had consumed alcohol the night before giving the statement, whether Smith offered leniency if Ray cooperated in finding an alleged associate, and whether Smith threatened Ray. The record of the suppression hearing plainly shows that Ray's motive at that proceeding was to question Officer Smith about circumstances bearing on the voluntariness of the statement, and not to delve into the contents of the statement.

[21] Ray's written motion to suppress confirms that his motive was confined to demonstrating involuntariness and a *Miranda* violation. *See Geiger*, 263 F.3d at 1038 (comparing defendant's state and federal motions to dismiss to determine similarity of motive). The motion argues only that Ray was improperly *Mirandized* and that his statement was involuntary. The motion makes no reference to the substance of Ray's statement.

[22] Ray's fundamental objective at the suppression hearing was not the same as his motive would have been had Smith testified at trial. The issue at trial was whether the evidence proved Ray's guilt beyond a reasonable doubt, not the circumstances of his confession. By the time of trial, neither voluntariness nor the alleged *Miranda* violation was even at issue. Rather, Ray's objective at trial would have been to vigorously challenge Officer Smith on the details of the oral and written statements, to cast doubt on his credibility and on the reliability and completeness of his version of Ray's statement. For instance, Ray's written statement says that "[f]irearms found on property were traded with meth." The statement

does not indicate which particular firearms were acquired via methamphetamine trafficking. Similarly, although the statement makes clear that Ray traded methamphetamine for stolen items, it never refers to a specific quantity of drugs.

Ray's counsel also would have had a motive to question Officer Smith about the substance of Ray's oral statements to Smith. In Smith's suppression hearing testimony, Smith "summarize[d]" Ray's oral statements. He testified that Ray admitted to trading methamphetamine for jewelry, tools, and recreational vehicles, and named his source of methamphetamine. Smith also testified to a purported admission that Ray knew the items he was receiving were stolen. Had Smith testified at trial, Ray's counsel certainly would have been motivated to develop more than a "summary" of Ray's oral statement. Counsel would have had a strong motive to cast doubt on Officer Smith's summary, by determining the specific questions that Smith asked Ray, testing the accuracy of Smith's recollection, and seeking to learn Ray's full responses to those questions. Smith's account of Ray's oral statement makes no reference to the quantity of methamphetamine being sold or exchanged, nor to the value of the stolen items received in exchange; a thorough cross-examination of Smith regarding his interview with Ray might have drawn out such facts. Ray's counsel also would have been motivated on cross-examination to reveal inconsistencies between Ray's written statement and Smith's version of Ray's oral statement. These motives stand in stark contrast to Ray's motive at the suppression hearing, which was limited to developing testimony concerning voluntariness and whether Ray was properly *Mirandized*.

We therefore conclude that the district court's "similar motive" determination must be reversed. The district court failed to properly compare Ray's "fundamental objective" at the suppression hearing to his motive at trial, and instead focused on Ray's *opportunity* to cross-examine Officer Smith. The district court noted that the government had a motive to

explore the details of Ray's statements and, from that, apparently inferred that Ray also had a motive to delve into the substance of the statements. But the government's only purpose in questioning Officer Smith about the details of the statement was to demonstrate voluntariness, under the theory that "[t]he detail that a person goes into is an indicia of how open, how comfortable they feel with the person that they're talking to." Thus, only the amount of detail—and not the accuracy of those details—was relevant to the suppression motion, and even after the district court permitted the government to explore the details of the statement, Ray continued to lack any motive to probe Officer Smith about the accuracy of the statement or about Smith's recollection.

**[23]** The extent of the district court's comparison of Ray's motives is contained in its conclusory statement that "[a] purely tactical decision not to develop particular testimony despite the same issue and level of interest at each proceeding does not constitute a lack of opportunity or a dissimilar motive for purposes of Rule 804(b)(1)." This is of course circular, in that it predicates its conclusion that Ray's counsel's decision was tactical on the unfounded assumption that the same issue and level of interest existed at each proceeding. Because it failed to directly compare Ray's "fundamental objectives" at trial and at the suppression hearing, the district court abused its discretion by admitting Smith's testimony. *See McFall*, 558 F.3d at 963 (district court's decision to admit or exclude evidence under Rule 804(b)(1) is reviewed for abuse of discretion).

Our conclusion that the district court should not have admitted Officer Smith's testimony does not end our inquiry. We must also determine whether the error was harmless. Generally, a nonconstitutional error at trial does not result in reversal if the government shows that the error was more probably than not harmless.[11] *See United States v. Vgeri*, 51

---

[11]Because the admission of Smith's testimony arguably violated Ray's Confrontation Clause rights, it may be appropriate to apply the "harmless

F.3d 876, 882 (9th Cir. 1995). To meet that standard, "the government must 'show a fair assurance that the verdict was not substantially swayed by the error.' " *United States v. Chase*, 340 F.3d 978, 993 (9th Cir. 2003) (en banc) (quoting *United States v. Bauer*, 132 F.3d 504, 510 (9th Cir. 1997)).

**[24]** The parties did not address the prejudicial effect of the district court's admission of Smith's testimony, but we have no difficulty concluding that the error was not harmless. As the government concedes, it would not have been able to introduce Ray's written statement at trial without Smith's testimony, because Smith was the only officer present when Ray executed the written statement. Aside from Ray's written and oral statements, both of which were admitted through Smith, there was no evidence directly tying him to the drugs, firearms, and stolen property in the compound. Nor did Lou's statement link Ray to the drugs, firearms, and stolen items, as it was redacted to comply with *Bruton*, and the district court instructed the jury that it could not consider Lou's statement against Ray when weighing his guilt or innocence.

Ray was one of five people living on the property; his confession was the critical piece of evidence linking *him* to the contraband found on the compound. In the absence of Ray's confession that he trafficked in methamphetamine, it would have been plausible that the drugs were Lou's alone. *See United States v. Barajas-Montiel*, 185 F.3d 947, 956 (9th Cir. 1999) (in cases of shared occupancy, government must intro-

---

beyond a reasonable doubt" standard of *Chapman v. California*, 386 U.S. 18, 24 (1967). *See, e.g.*, *United States v. Gillam*, 167 F.3d 1273, 1277 (9th Cir. 1999) ("Once we find a [Confrontation Clause] error, the prosecution has the burden of showing that the error was harmless beyond a reasonable doubt."). We need not determine which standard applies here. Because we conclude that the admission of Smith's statement was not harmless under the less stringent nonconstitutional standard, it follows that the government failed to show that the error was harmless beyond a reasonable doubt.

duce "some evidence tying the defendant to the particular contraband"). Although there was circumstantial evidence connecting Ray to the drugs and guns, such as the W-2 forms, wedding photos, and other personal documents found in the bedroom, Ray's confession was by far the most compelling and vital evidence. The government admitted as much at the hearing on the motion to introduce Smith's testimony, when it stated, "of course it's crucial to our case because it is a confession."

**[25]** The prosecutor's closing argument amply illustrates just why its case against Ray would have unraveled without the confessions. After briefly explaining the nature of the charges against Ray and Lou, the prosecutor told the jury: "Go to the evidence in this case. *The crux of the case* against Raymond Duenas is the confession. In fact, two confessions." (emphasis added). The prosecutor described the circumstances surrounding Ray's confession in some detail, and then argued to the jury, "Now you've got these confessions, both orally and in writing. Should you rely on them[?]. Absolutely. Because they are corroborated by what was found in their premises." The government viewed the totality of the other evidence, which did not directly link Ray to the drugs, as evidence that corroborated Ray's confessions, not as evidence sufficient to sustain Ray's conviction. The government reiterated this point once more toward the end of its argument, after recapping the circumstantial evidence: "In short, everything corroborates their confession." Because the government chose to make the confessions the centerpiece of its case, we are compelled to conclude that the erroneous admission of Officer Smith's testimony was not harmless. While it may have been *possible* for a jury to convict Ray on the basis of the circumstantial evidence alone, the government has failed to " 'show a fair assurance that the verdict was not substantially swayed by the error.' " *Chase*, 340 F.3d at 993 (quoting *Bauer*, 132 F.3d at 510). We therefore hold that the error was not harmless.

## VII.

**[26]** The district court properly denied Ray's and Lou's motion to suppress the physical evidence seized at the house. Although the presence of the media during the search may have violated the Fourth Amendment, the district court properly declined to exclude the evidence. The exclusionary rule does not apply where the presence of the media does not expand the scope of or interfere with the execution of the search. The evidence sufficiently demonstrated that the materials found in "Lou room/Ray's room" were under Lou's dominion and control, and thus there was sufficient evidence to support Lou's convictions. The district court therefore did not err in denying Lou's Rule 29 motion for a judgment of acquittal. However, because Ray did not have a "similar motive" to cross-examine Officer Frankie Smith at the suppression hearing as at the trial, the district court erred in admitting Officer Smith's suppression-hearing testimony into evidence. Ray's conviction must therefore be reversed. We do not address his arguments concerning the voluntariness of his statements or the sufficiency of the evidence. We vacate Ray's sentence and reverse Ray's conviction, and affirm Lou's conviction.

**No. 09-10492: VACATED and REVERSED.**

**No. 09-10496: AFFIRMED.**